Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/08/2023 09:07 AM CDT

State of Nebraska, appellee, v.
Anthony J. Garcia, appellant.

___ N.W.2d ___

Filed September 8, 2023.    No. S-18-979.

1. **Appeal and Error.** To be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue it in the party's initial brief.

2. \_\_\_\_. Where an appellant's brief contains conclusory assertions unsupported by a coherent analytical argument, the appellant fails to satisfy the requirement that the party asserting the alleged error must both specifically assign and specifically argue it in the party's initial brief.

3. **Records: Appeal and Error.** In both the criminal and postconviction context, an appellate court will not ordinarily scour the record in search of facts that might support an appellant's claim.

4. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. And where the facts are largely undisputed, the ultimate question is an issue of law.

5. **Effectiveness of Counsel: Appeal and Error.** With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision.

6. **Effectiveness of Counsel: Proof: Appeal and Error.** To prevail on a claim of ineffective assistance of counsel under *Strickland v.*

*Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order.

7. **Effectiveness of Counsel: Proof.** To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

8. **Effectiveness of Counsel: Proof: Words and Phrases.** To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

9. **Effectiveness of Counsel: Trial: Presumptions: Appeal and Error.** There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions. When reviewing claims of alleged ineffective assistance of counsel, trial counsel is afforded due deference to formulate trial strategy and tactics.

10. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

11. **Effectiveness of Counsel: Appeal and Error.** Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity.

12. **Effectiveness of Counsel: Records: Proof: Appeal and Error.** An appellate court can determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance.

13. **Effectiveness of Counsel: Appeal and Error.** In order to preserve a claim of ineffective assistance of counsel when new counsel represents the defendant on direct appeal, the appellant must make specific allegations of the conduct the appellant claims constituted deficient performance by trial counsel.

14. **Effectiveness of Counsel: Waiver: Records: Appeal and Error.** Appellate counsel does not waive a claim of ineffective assistance of trial counsel by failing to specifically allege and argue prejudice,

because doing so would often require details unlikely to be found in the record or known to the defendant without further inquiry. It is nevertheless advisable for appellate counsel to specifically argue prejudice if counsel believes the details in the trial record pertinent to the prejudice prong of the ineffective assistance of counsel inquiry are sufficient to adequately review the question.

15. **Effectiveness of Counsel: Records: Proof: Appeal and Error.** Appellate courts are free to determine on direct appeal the effectiveness of trial counsel on the prejudice prong if the record affirmatively proves or rebuts the claim on that ground.

16. **Courts: Motions for Mistrial: Motions for New Trial: Appeal and Error.** A trial court is vested with considerable discretion in passing on motions for mistrial and for a new trial, and an appellate court will not disturb a trial court's decision whether to grant a motion for mistrial or a motion for new trial unless the court has abused its discretion.

17. **Judges: Witnesses: Appeal and Error.** An appellate court's deference to the trial court stems in part from the recognition that the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the surrounding circumstances and atmosphere of the trial.

18. **Judges: Evidence: Verdicts: Jurors: Appeal and Error.** The trial judge has a special perspective on the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record. The trial court is likewise in a better position to make credibility determinations of jurors' statements concerning whether they were influenced by extraneous information.

19. **Constitutional Law: Trial: Joinder.** There is no constitutional right to a separate trial.

20. **Trial: Joinder: Appeal and Error.** Whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related so as to be joinable and (2) whether the joinder was prejudicial to the defendant.

21. **Trial: Joinder: Presumptions.** There is a strong presumption against severing properly joined counts.

22. **Trial: Joinder: Appeal and Error.** While Neb. Rev. Stat. § 29-2002 (Reissue 2016) presents two separate questions, there is no error under either subsection (1) or subsection (3) if joinder was not prejudicial, and a denial of a motion to sever will be reversed only if clear prejudice and an abuse of discretion are shown.

23. ____: ____: ____. An appellate court will find an abuse of discretion in the denial of a motion to sever only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice.

24. **Trial: Joinder: Proof.** A defendant opposing joinder of charges has the burden of proving prejudice. To carry that burden, a defendant must show compelling, specific, and actual prejudice from the court's refusal to grant the motion to sever.

25. **Trial: Joinder.** Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial.

26. ____: ____. Prejudice from joinder cannot be shown if evidence of one charge would have been admissible in a separate trial of another charge.

27. **Trial: Joinder: Juries: Evidence.** Joined charges do not usually result in prejudice if the evidence is sufficiently simple and distinct for the jury to easily separate evidence of the charges during deliberations.

28. **Criminal Law: Trial: Juries: Appeal and Error.** Whether a jury is to be kept together before submission of the cause in a criminal trial is left to the discretion of the trial court.

29. ____: ____: ____: ____. To warrant reversal, denial of a motion to sequester the jury before submission of the cause must be shown to have prejudiced the defendant.

30. **Venue: Appeal and Error.** An appellate court reviews the denial of a motion to change venue for abuse of discretion.

31. **Juror Qualifications.** The law does not require that a juror be totally ignorant of the facts and issues involved; it is sufficient if the juror can lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court.

32. **Courts: Trial: Mental Competency.** The question of competency to stand trial is one of fact to be determined by the district court.

33. **Courts: Trial: Mental Competency: Appeal and Error.** A court's decision regarding competency will not be disturbed absent insufficient evidence to support that finding.

34. **Trial: Pleas: Mental Competency.** A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense.

35. **Trial: Mental Competency.** The competency standard includes both (1) whether the defendant has a rational as well as factual understanding of the proceedings against him or her and (2) whether the defendant has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding.

36. **Mental Competency.** There are no fixed or immutable signs of incompetence, and a defendant can meet the modest aim of legal

competency, despite paranoia, emotional disorders, unstable mental conditions, and suicidal tendencies.

37. **Criminal Law: Evidence: Jury Instructions.** In order to justify an alibi instruction, there must be evidence that the defendant was at some other place during the commission of the crime.

38. **Criminal Law: Evidence: Proof.** The evidence must show that the defendant was at such other place for a length of time that it was impossible for him or her to have been at the place where the crime was committed, either before or after the time he or she was at such other place.

39. **Trial: Prosecuting Attorneys: Appeal and Error.** When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, an appellate court will review the record only for plain error.

40. **Appeal and Error.** Appellate courts apply the plain error exception to the contemporaneous-objection rule sparingly.

41. **Trial: Prosecuting Attorneys: Words and Phrases.** Prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.

42. **Trial: Prosecuting Attorneys.** In assessing allegations of prosecutorial misconduct, a court first determines whether the prosecutor's remarks were improper. It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial.

43. **Trial: Prosecuting Attorneys: Due Process.** Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process.

44. **Trial: Prosecuting Attorneys.** Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.

45. **Trial: Prosecuting Attorneys: Appeal and Error.** In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, appellate courts consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether trial counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction.

46. **Trial: Prosecuting Attorneys: Juries.** A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.

47. **Constitutional Law: Statutes: Appeal and Error.** The constitutionality of a statute presents a question of law, which an appellate court independently reviews.

48. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Appeal and Error.** When reviewing the sufficiency of the evidence to sustain the trier of fact's finding of an aggravating circumstance, the relevant question for the Nebraska Supreme Court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the aggravating circumstance beyond a reasonable doubt.

49. **Constitutional Law: Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Appeal and Error.** When an appellate court reviewing a death penalty invalidates one or more of the aggravating circumstances, or finds as a matter of law that any mitigating circumstance exists that the sentencing panel did not consider in its balancing, the appellate court may, consistent with the U.S. Constitution, conduct a harmless error analysis or remand the cause to the district court for a new sentencing hearing.

50. **Sentences: Death Penalty: Jury Instructions: Appeal and Error.** In order for a state appellate court to affirm a death sentence after the sentencer was instructed to consider an invalid factor, the court must determine what the sentencer would have done absent the factor.

51. **Constitutional Law: Convictions: Appeal and Error.** Even a constitutional error which was harmless beyond a reasonable doubt does not warrant the reversal of a criminal conviction.

52. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Proof: Appeal and Error.** Harmless error review in a capital sentencing case looks to whether it is clear beyond a reasonable doubt that the sentencing court's decision would have been the same absent any reliance on an invalid aggravator.

53. **Sentences: Death Penalty: Appeal and Error.** In a capital sentencing proceeding, this court conducts an independent review of the record to determine if the evidence is sufficient to support imposition of the death penalty.

54. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Appeal and Error.** When reviewing the sufficiency of the evidence to sustain the trier of fact's finding of an aggravating circumstance, the relevant question for the Nebraska Supreme Court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the aggravating circumstance beyond a reasonable doubt.

55. ____: ____: ____: ____. A sentencing panel's determination of the existence or nonexistence of a mitigating circumstance is subject to de novo review by the Nebraska Supreme Court.

56. ____: ____: ____: ____. In reviewing a sentence of death, the Nebraska Supreme Court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances support the imposition of the death penalty.

57. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Juries: Waiver.** Under Nebraska's capital sentencing scheme, a jury, if not waived, only determines the existence of aggravating circumstances.

58. ____: ____: ____: ____: ____. A jury's participation in the death penalty sentencing phase, if not waived, ceases after the determination of aggravating circumstances. A three-judge panel determines the existence of mitigating circumstances, weighs aggravating and mitigating circumstances, and determines the sentence.

59. **Sentences: Death Penalty: Appeal and Error.** Proportionality review requires the Nebraska Supreme Court to compare the aggravating and mitigating circumstances with those present in other cases in which a district court imposed the death penalty to ensure that the sentence imposed in the case under review is no greater than those imposed in other cases with the same or similar circumstances.

60. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Appeal and Error.** If an error is harmless beyond a reasonable doubt in a capital sentencing case, the Nebraska Supreme Court should affirm the sentence of the district court. If the error is not harmless, the Nebraska Supreme Court cannot reweigh the aggravators and mitigators and resentence a defendant; rather, it must remand the matter to the district court for resentencing.

61. **Constitutional Law: Criminal Law: Jury Trials: Appeal and Error.** Whether cumulative error deprived a criminal defendant of his or her Sixth Amendment right to a trial by an impartial jury presents a question of law to be reviewed de novo.

Appeal from the District Court for Douglas County: GARY B. RANDALL, Judge. Affirmed.

Jeffery A. Pickens and Sarah P. Newell, of Nebraska Commission on Public Advocacy, for appellant.

Michael T. Hilgers, Attorney General, and James D. Smith for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, and PAPIK, JJ., and ARTERBURN, Judge.

Heavican, C.J.
## I. INTRODUCTION

The appellant, Anthony J. Garcia, was convicted of four counts of first degree murder, four counts of use of a weapon to commit a felony, and one count of attempted burglary. He was sentenced to death for each of the four murder convictions, 19 to 20 years' imprisonment for two of the use of a weapon convictions, 49 to 50 years' imprisonment for the remaining use of a weapon convictions, and 20 months' to 5 years' imprisonment for the attempted burglary conviction. This automatic appeal follows.[1]

## II. BACKGROUND

These facts involve two sets of murders committed 5 years apart. On March 13, 2008, William Hunter discovered the bodies of his 11-year-old son, Thomas Hunter (Hunter), and Shirlee Sherman, aged 57 and employed as the family's cleaner, at the Hunter home in the Dundee neighborhood of Omaha, Nebraska. Both Hunter's and Sherman's carotid arteries and jugular veins were severed, and the knives used to inflict those wounds were left in the victims' necks.

Just over 5 years later, on May 14, 2013, the bodies of Roger Brumback and Mary Brumback were discovered in their home, also in Omaha. Roger and Mary were stabbed in the neck; Roger was also shot. Mary's carotid artery and jugular vein were severed, as was Roger's carotid artery.

The Brumback murders revived the investigation into the Hunter/Sherman murders because of a connection between William Hunter and Roger, who were both employed by Creighton University (Creighton) in Omaha in its pathology department. Further investigation led law enforcement to suspect Garcia of both sets of murders. Garcia was eventually arrested in Illinois on July 15, 2013. Search warrants were then obtained and executed for Garcia's home in Terre Haute, Indiana, and at his parents' home in California. Garcia was

---

[1] See Neb. Rev. Stat. § 29-2525 (Reissue 2016).

later charged with both sets of murders and the associated weapons charges, as well as an attempted burglary at the home of Chhanda Bewtra, another individual employed in Creighton's pathology department.

The State's theory of the crimes was that Garcia committed each set of murders as revenge for his termination from Creighton's pathology residency program. In support of this theory, in addition to presenting factual evidence regarding the two murder scenes and Garcia's physical and digital movements at the time of the murders, the State presented evidence of Garcia's time at Creighton. The State also offered evidence of Garcia's professional and personal life between the two sets of murders to show that his termination from Creighton's residency program, at least occasionally, prevented Garcia from obtaining a medical license in different states and from generally considering himself to be successful.

Garcia was represented by "Team Motta," composed of lawyers primarily practicing in Chicago, Illinois, but admitted pro hac vice in Nebraska for purposes of representing Garcia. The Chicago members of Team Motta were Robert Motta, Sr.; Robert Motta, Jr.; and Alison Motta. In order to be admitted pro hac vice, Team Motta was required to associate with local counsel; at some point prior to trial in Douglas County, original local counsel withdrew, and new local counsel— notably including Omaha attorney Jeremy Jorgenson—joined as counsel.

As will be noted in more detail below, when original local counsel withdrew, Team Motta needed to be readmitted pro hac vice. At this time, Alison Motta's motion to be admitted pro hac vice was denied, while the motions of the remainder of Team Motta were granted. As such, by the time of trial, Alison Motta was not able to appear in court to represent Garcia. Throughout our opinion, we refer to Team Motta as defense or trial counsel; where referencing Alison Motta specifically, we refer to her as "Motta."

Trial eventually began in late September 2016, after which the jury found Garcia guilty on all charges. A notice of aggravation had been filed with regard to the four murder charges, and thus, Garcia was death eligible. Following a hearing on aggravating factors, the jury found two aggravators each as to the Hunter/Sherman murders and three aggravators each as to the Brumback murders.

At this point in time, the district court appointed the Commission on Public Advocacy (Commission) as cocounsel for purposes of Garcia's sentencing hearing. The details surrounding this are also set forth in more detail below. By the time this sentencing hearing was held, however, Team Motta had withdrawn from representing Garcia and only the Commission acted as representation for Garcia. Following a further sentencing hearing at which Garcia produced evidence of mitigating factors, a three-judge panel sentenced Garcia to death for each of the four murder convictions. The Commission continues to represent Garcia on appeal.

Additional factual and procedural background is incorporated below.

### III. ASSIGNMENTS OF ERROR

Garcia assigns 130 separate assignments of error, which generally comprise 15 separate topic areas: (1) motions to suppress and evidentiary objections, (2) testimony of Cecilia Hoffmann, (3) interlocutory appeals, (4) motion to sever, (5) change of venue and jury sequestration, (6) competency, (7) discovery, (8) DNA and digital evidence, (9) miscellaneous claims of ineffective assistance of counsel, (10) closing arguments, (11) aggravating circumstances, (12) mitigating circumstances, (13) constitutionality of the death penalty, (14) balancing and proportionality, and (15) broad-scale ineffectiveness and procedural bar. We have adopted this framework to address Garcia's assignments of errors. We set forth in detail a pertinent list of assigned errors—consolidated and restated—at the commencement of each topic area.

We note that throughout his brief, Garcia often "incorporates" facts, propositions of law, legal standards, assignments of error, arguments, or any combination thereof from other sections of his brief and, at times, even other parts of the record. Sometimes, these "incorporations" identify the source of the incorporated material. At other times, they do not. We determine that, generally, Garcia's incorporations are insufficient for us to consider the "incorporated" materials as part of the related argument. This outcome is supported by several propositions of this court.

[1-3] First, we have long held that to be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue the error in the party's initial brief.[2] Where an appellant's brief contains conclusory assertions unsupported by a coherent analytical argument, the appellant fails to satisfy such requirement.[3] Moreover, we have held that, in both the criminal and post-conviction context, an appellate court will not ordinarily scour the record in search of facts that might support an appellant's claim.[4]

Additionally, in the context of petitions for further review, we have noted that incorporation by reference of the assignments of error and arguments made in one's appellate brief is not an appropriate way to separately and concisely set forth the assignments of error in a petition for further review.[5]

For the purposes of briefs filed with the appellate courts, we do not encourage the practice of incorporating by reference any content material to a party's argument, particularly

---

[2] *Timothy L. Ashford, PC LLO v. Roses*, 313 Neb. 302, 984 N.W.2d 596 (2023).

[3] *Id*.

[4] See *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021); *State v. Childs*, 309 Neb. 427, 960 N.W.2d 585 (2021).

[5] *State v. Kays*, 289 Neb. 260, 854 N.W.2d 783 (2014), *overruled on other grounds, State v. Malone*, 308 Neb. 929, 957 N.W.2d 892 (2021).

when such references are unclear, and any party who does incorporate by reference does so at the party's own peril.[6]

## IV. ANALYSIS

### 1. Motions to Suppress and Evidentiary Objections

#### (a) Assignments of Error

Collectively, Garcia's first 13 assignments of error discuss Garcia's allegations of district court error and ineffective assistance of trial counsel with regard to evidence obtained through the stop and subsequent search warrants undertaken of Garcia's vehicle and home, as well as of the home of his parents. We consolidate and renumber those assignments for ease of disposition.

Garcia assigns that (1) the district court erred in overruling his motion to suppress evidence from his warrantless stop and arrest in Illinois because the arresting officer had no knowledge of the facts supporting Garcia's arrest and because the collective knowledge doctrine was inapplicable.

In addition, Garcia assigns that his trial counsel was ineffective in (2) not preserving his suppression arguments with regard to the evidence obtained from the stop of his vehicle, including the failure to prepare for, make, and preserve objections to items and documents seized from Garcia's vehicle; (3) not preserving his suppression arguments with regard to the evidence obtained from searches under the remaining warrants, including the failure to prepare for, make, and preserve objections to documents seized under those warrants; (4) failing to prepare for, make, and preserve objections to records and testimony relating to Garcia's behavior as a medical resident; (5) stipulating to the admissibility of records and testimony relating to Garcia's behavior as a medical resident; (6) failing to argue that the State's motion in limine was time barred in light of the district court's January 28, 2016, order;

---

[6] See *State v. Buol*, 314 Neb. 976, ___ N.W.2d ___ (2023).

(7) failing to argue that the State did not carry its burden regarding the sufficiency of the warrants by omitting proof of the May 25, 2013, warrant upon which all other warrants were premised; (8) failing to properly assert and prove the allegations in Garcia's *Franks v. Delaware*[7] motion; (9) failing to submit a brief in support of Garcia's motion in limine; (10) failing to seek a jury instruction clarifying the limited purpose for which various documents from Garcia's home and vehicle were admitted; and (11) failing to seek a jury instruction clarifying the limited purpose for which Garcia's employment records and history were admitted.

### (b) Standard of Review

[4] In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review.[8] Regarding historical facts, we review the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination.[9] And where the facts are largely undisputed, the ultimate question is an issue of law.[10]

### (c) Additional Background

The Omaha Police Department (OPD) and the Federal Bureau of Investigation (FBI) were working together to investigate the Hunter/Sherman and Brumback murders, which law enforcement had theorized were connected. The investigation led to Garcia, who resided in Terre Haute. FBI agents and OPD officers traveled to that area in July 2013 to surveille and eventually arrest Garcia, whose cell phone was being monitored by OPD.

---

[7] *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 667 (1978).

[8] *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022).

[9] *Id.*

[10] *Id*.

Upon arrival in Terre Haute, the investigating FBI agents learned from OPD that Garcia had recently left the Terre Haute area and had traveled to southern Illinois. The agents then traveled to the same area in an effort to locate Garcia, making contact with agents from the FBI office located in Springfield, Illinois, while en route to southern Illinois. Garcia's vehicle was located outside a hotel in Salem, Illinois.

The agents checked into a hotel with a vantage point over Garcia's hotel and vehicle and made a plan for the next day's surveillance. That plan called for the agents who were watching Garcia's hotel and vehicle to begin surveillance at 5 a.m. One agent awoke a few minutes before that time and discovered that Garcia's vehicle was no longer parked at the hotel. Agents contacted OPD, whose monitoring indicated that Garcia was headed south on Interstate 57, and so those agents also drove south on Interstate 57.

Because Garcia was not being monitored in real time, but instead only every 30 minutes, agents did not immediately locate Garcia. But Garcia's vehicle was eventually located near Benton, Illinois, heading southbound. In consultation with FBI agents from the Springfield office, a decision was made to have the Illinois State Patrol stop Garcia's vehicle so that FBI agents could arrest him. At approximately 6:30 a.m., Garcia was arrested and transported first to Jonesboro, Illinois, and eventually to Omaha.

### (d) District Court Error

On appeal, Garcia contends that the district court erred in not suppressing the evidence derived from Garcia's stop and arrest in Illinois. Specifically, Garcia contends that the arresting officer had no knowledge of the facts justifying the arrest and the collective knowledge doctrine was inapplicable in these circumstances. As such, Garcia contends that the failure to suppress this evidence violated his rights under the 4th, 5th, and 14th Amendments to the U.S. Constitution and article I, §§ 3, 7, and 11, of the Nebraska Constitution. Garcia does

not assign on appeal that there was insufficient probable cause to support his arrest.

The parties are in agreement that at the time of Garcia's arrest, an arrest warrant had been contemplated by Nebraska authorities, but had not yet been issued. As such, Garcia's arrest was warrantless. Under Illinois law, an officer may arrest someone when they have "reasonable grounds" to believe that a warrant for the person's arrest has been issued in Illinois or in another jurisdiction or if there are "reasonable grounds to believe that the person is committing or has committed an offense."[11] The statutory phrase "reasonable grounds" has the same substantive meaning as "probable cause."[12] "Where officers are acting in concert in investigating a crime or possible crime, probable cause can be established from all the information collectively received by the officers even if not known to the arresting officer."[13]

We read Garcia's argument as conceding that he could be arrested without a warrant upon a finding of probable cause and agreeing that probable cause to support an arrest can be gathered via the collective knowledge doctrine. But Garcia argues that in this case, there was insufficient collective knowledge to support a finding of probable cause. Specifically, Garcia argues that the Illinois troopers had no involvement or knowledge of the underlying investigation into Garcia, as neither those troopers nor their agency were involved in investigating the murders. Rather, the only Illinois law enforcement officials involved were the FBI agents from the Springfield office, and the Illinois troopers were only contacted after the investigating officers lost track of Garcia. Moreover, the FBI

---

[11] 725 Ill. Comp. Stat. Ann. 5/107-2 (LexisNexis 2000). See Neb. Rev. Stat. § 29-404.02 (Cum. Supp. 2022).

[12] *People v. Lee*, 214 Ill. 2d 476, 484, 828 N.E.2d 237, 293 Ill. Dec. 267 (2005).

[13] *People v. Fox*, 155 Ill. App. 3d 256, 264, 508 N.E.2d 475, 481, 108 Ill. Dec. 314, 320 (1987). See *State v. Huff*, 282 Neb. 78, 802 N.W.2d 77 (2011).

agents investigating Garcia were not the same FBI agents contacting the troopers who ultimately effected the stop. Additionally, Garcia notes that only one of the Illinois troopers involved was in direct contact with the FBI, and he was only told to follow a vehicle matching a particular description. He was not told who he was stopping and learned just before he made the stop that it was in connection with a homicide investigation.

To the extent that Garcia argues the collective knowledge doctrine is inapplicable because the Illinois troopers were from Illinois and not Nebraska, we reject this assertion. Garcia directs us to no authority, and we can find none, that suggests that law enforcement agencies cannot utilize the collective knowledge doctrine when sharing information across jurisdictions. In fact, case law and secondary sources suggest the contrary.[14]

Garcia ultimately suggests that the collective knowledge doctrine is inapplicable because the FBI agents with knowledge of the investigation were not in direct communication with the troopers who stopped Garcia, and those troopers, as well as the FBI agents who communicated with them, did not possess any knowledge about Garcia or the investigation. But as we have noted above, both Illinois and Nebraska law provide that probable cause can be established from all the information collectively received by the officers even if not known to the arresting officer. And Garcia directs us to no authority that limits this rule. As such, we reject this assertion.

Garcia cites to several cases—*U.S. v. Blair*,[15] *U.S. v. Lyons*,[16] and *U.S. v. Nafzager*[17]—which he argues support his position. Having reviewed these cases, we find them distinguishable on their facts. Because, contrary to Garcia's argument,

---

[14] Annot., 101 A.L.R.6th 331 (2015) (collecting cases).

[15] *U.S. v. Blair*, 524 F.3d 740 (6th Cir. 2008).

[16] *U.S. v. Lyons*, 687 F.3d 754 (6th Cir. 2012).

[17] *U.S. v. Nafzager*, 974 F.2d 906 (7th Cir. 1992).

the collective knowledge doctrine is applicable and because Garcia does not otherwise challenge the finding that there was probable cause to support his arrest, we find no merit to Garcia's first assignment of error.

### (e) Ineffective Assistance of Counsel

*(i) Standard of Review and Propositions of Law*

[5] With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*,[18] an appellate court reviews such legal determinations independently of the lower court's decision.[19]

[6-8] Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland*, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[20] An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order.[21] To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[22] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[23] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[24]

---

[18] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[19] *State v. Jennings*, 312 Neb. 1020, 982 N.W.2d 216 (2022).

[20] *State v. Wood, supra* note 4.

[21] *Id.*

[22] *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

[23] *Id*.

[24] *Id*.

[9] There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions.[25] When reviewing claims of alleged ineffective assistance of counsel, trial counsel is afforded due deference to formulate trial strategy and tactics.[26]

[10] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.[27]

[11-13] Assignments of error on direct appeal regarding effective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity.[28] Moreover, an appellate court can determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance.[29] Thus, in order to preserve a claim of ineffective assistance of counsel when new counsel represents the defendant on direct appeal, the appellant must make specific allegations of the conduct the appellant claims constituted deficient performance by trial counsel.[30]

[14,15] In contrast, appellate counsel does not waive a claim of ineffective assistance of trial counsel by failing to specifically allege and argue prejudice, because doing so would often require details unlikely to be found in the record or known

---

[25] *State v. Anders*, 311 Neb. 958, 977 N.W.2d 234 (2022).

[26] *Id*.

[27] *Id*.

[28] *State v. Mrza, supra* note 22.

[29] *State v. Wood, supra* note 4.

[30] *Id*.

to the defendant without further inquiry.[31] It is, nevertheless, advisable for appellate counsel to specifically argue prejudice if counsel believes the details in the trial record pertinent to the prejudice prong of the ineffective assistance of counsel inquiry are sufficient to adequately review the question.[32] Appellate courts are free to determine on direct appeal the effectiveness of trial counsel on the prejudice prong if the record affirmatively proves or rebuts the claim on that ground.[33]

### (ii) Evidence From Stop and Remaining Warrants

In his second and third assignments of error, Garcia assigns that his trial counsel erred in failing to object to the receipt of evidence obtained from the stop of his vehicle and also from "the Receipt of Evidence Obtained from the Remaining Warrants." More specifically, Garcia argues that counsel was ineffective in the failure to prepare for, make, and preserve objections to items and documents, including a shoulder bag with an "LSU" logo and its contents, seized from Garcia's vehicle and from his home.

We generally agree with Garcia's contention that trial counsel's objections to these items were haphazard. For example, prior to officers' testifying to the stop, counsel sought a renewal of the motions to suppress and motion to quash. But objections to specific pieces of evidence were inconsistent. For example, objections to the admission of a cell phone retrieved at the stop appear to have been made, but no objection was made to the admission of Garcia's wallet or its contents, or the LSU shoulder bag and its contents. One item that was not admitted was an LSU laboratory coat; however, a tablet computer was found in the pocket of that laboratory coat and no objection was raised to that item.

---

[31] *Id.*

[32] *Id*.

[33] *Id*.

In addition to now asserting that trial counsel was ineffective in failing to preserve his suppression arguments, Garcia argues that counsel was generally unprepared to deal with the admissibility of the documents seized from Garcia's vehicle and home. Garcia continues:

> Because of the volume of the documents submitted, the inability to track the Mottas' objections through the proceedings, and the admission of three separate boxes of materials in their entirety summed up simply by a one-word objection: "403", successor counsel cannot individually demonstrate the extent of deficient performance or resulting prejudice as to each and every document seized and admitted. . . . Certainly, not all of the prejudicial evidence would have been excluded, but . . . it stands to reason that a significant number of these items would have been excluded had the Mottas been more prepared.[34]

As we have noted above, in order to preserve a claim of ineffective assistance of counsel when new counsel represents the defendant on direct appeal, the appellant must make specific allegations of conduct the appellant claims constituted deficient performance by trial counsel. We find the allegations here lacking.

On appeal, Garcia takes issue with documents that were admitted at trial. While this record is undoubtedly large, what is contained within it is known. In order for us to determine whether trial counsel was deficient in not objecting to certain documents, appellate counsel has an obligation to inform this court of the specific documents complained of. A reference to *all* documents would generally be insufficient in any case, and especially where counsel also concedes that certain documents would no doubt be admissible. We decline to search through every document offered in this case to determine which may or may not be inadmissible for any variety of prohibited

---

[34] Brief for appellant at 173.

reasons under our rules of evidence. We accordingly conclude that the allegation of ineffective assistance of counsel on these issues is insufficient.

Garcia also takes more specific issue with the LSU shoulder bag. This bag was found in Garcia's vehicle at the time of his arrest, along with a laboratory coat, also with the LSU logo. Law enforcement had theorized that Garcia might be headed to Louisiana in order to kill individuals connected with the Louisiana State University School of Medicine.

The laboratory coat was excluded from evidence, but the record indicates that trial counsel objected too late to a photograph taken of the LSU shoulder bag. On appeal, Garcia argues that trial counsel failed to object to this bag and its contents. Garcia does not allege what the contents of the bag were, and such is not apparent from the photographs offered at trial. Garcia does suggest that these contents were later added to other documents offered in this case. We discussed such documents above.

However, we conclude that trial counsel failed to object to the LSU shoulder bag and appellate counsel has adequately alleged deficient conduct as much here. But we conclude that there was no prejudice in the admission of the LSU shoulder bag. We observe that the jury was aware that Garcia had earlier been affiliated with LSU. Unlike the LSU laboratory coat found in Garcia's vehicle (which, as we note, was objected to and excluded from evidence), the presence of a university shoulder bag belonging to a person who had previously been a medical resident at that university is not prejudicial.

Garcia also suggests that counsel was deficient in not objecting to the admission of the bank cards in his wallet, as well as the cell phone and tablet computer. We conclude that we lack the record to determine what information might have been found on those devices, and thus, we conclude that we cannot determine whether counsel was ineffective in failing to properly object to these items.

### (iii) Evidence Regarding Time Spent as
### Creighton Medical Resident

In his fourth, fifth, and sixth assignments of error, Garcia contends that his counsel was ineffective in handling the admission of evidence relating to his time spent as a Creighton medical resident, including whether counsel properly prepared for, made, and preserved objections to that evidence; whether counsel was ineffective in stipulating to the admissibility of that evidence as a business record under Neb. Rev. Stat. § 27-803(5) (Reissue 2016); and whether counsel was ineffective in failing to argue that the State effectively waived the admissibility of such evidence by filing its motion in limine out of time.

We first reject the argument that the admission of this evidence was effectively waived because it was filed after the court's deadline set in its order of January 28, 2016. A review of the record shows that as of that date, the court and the parties anticipated that trial would be held on April 4. Subsequently, a new judge was assigned the case, local counsel withdrew, new local counsel joined the case, many more evidentiary motions were filed both by the State and by Garcia, and trial did not occur until October 2016. In short, even if there was deficient conduct by counsel in failing to object on those grounds, we find no prejudice in the court's allowing the filing of this motion on these facts.

We turn to Garcia's twin contentions that trial counsel erred in stipulating to the admission of the employment records and in their general handling of the admissibility of those records. As noted above, the appellant must make specific allegations of conduct the appellant claims constituted deficient performance. Though aware of what records were offered at trial, Garcia has failed to identify the records that he now asserts were inadmissible. For this reason, we find that these allegations of ineffective assistance of counsel are insufficient.

### (iv) Proof of May 25, 2013, Warrant

Garcia assigns that trial counsel erred in failing to argue that the State did not carry the burden of showing the sufficiency of the search warrants executed against him because the State did not offer proof of the May 25, 2013, warrant upon which all other warrants were premised. According to Garcia, this May 25 warrant was for Garcia's cell phone and cell tower records, and the information gathered from this warrant informed all subsequent warrants, including the one for Garcia's home and for businesses that Garcia patronized prior to and following the Brumback murders. As Garcia notes, this warrant is not part of our record. We conclude that we lack a record on direct appeal to decide this allegation of ineffective assistance of counsel.

### (v) Franks *Motion*

Garcia also assigns that his counsel was ineffective in failing to preserve his suppression arguments by failing to properly assert and prove the allegations contained in his *Franks* motion.[35] Garcia further argues that "[i]n addition to raising the issue above from a failure of proof standpoint, [trial counsel] should also have argued the issue as a material omission under *Franks.* Similarly, [trial counsel] failed to present sufficient evidence relating to alternate suspects as discussed below and incorporated herein."[36]

When considered in conjunction with Garcia's June 11, 2014, motion under *Franks*, we understand Garcia to be arguing that certain misrepresentations and omissions were made in the affidavits in support of several search warrants executed against Garcia. In that motion, Garcia directs us to language in the affidavits regarding Garcia's time with Creighton's pathology department and contends that certain paragraphs

---

[35] See *Franks v. Delaware, supra* note 7.

[36] Brief for appellant at 169.

of the probable cause affidavit were misleading. Garcia notes that one affidavit stated that, when asked, William Hunter and Roger verified that Garcia was terminated and did not complete the program, when, in fact, "Garcia received at least two excellent letters of reference from Drs. Hunter and Brumback [that] outlined the work . . . Garcia completed and indicated that he completed the year. Both of these letters were intentionally omitted [from the affidavit]."

In addition, Garcia's motion directs the court to five evaluation forms, also omitted from the affidavit, from Garcia's time at Creighton in which Garcia was given "'high scores'" and was rated as "diligent, a hard worker, and with a great attitude." Garcia also contends that the affidavits did not include information that there were other suspects that had essentially the same motive as the State alleges Garcia did—a grudge against Creighton's pathology department. Garcia suggests that this omission was also misleading. Finally, Garcia argues that the affidavits state that he was arrested pursuant to an OPD warrant, when, in fact, he was arrested without a warrant. Garcia also points to some inconsistencies in witness lineups. The district court held a hearing on the *Franks* motion and concluded that Garcia had not met his initial burden of a "'substantial preliminary showing,' . . . of 'deliberate falsehood or a reckless disregard for the truth,' supported by an offer of proof."[37]

Generously construed, Garcia seems to limit his assignment to his two primary allegations as raised in his *Franks* motion—the Creighton letters of reference and the existence of alternate suspects. To the extent other allegations that may fit under *Franks* might exist, those have not been sufficiently alleged on appeal or for a postconviction action.

The basis of Garcia's argument is that counsel failed to introduce sufficient evidence to support the *Franks* motion.

---

[37] See *State v. Stickelman*, 207 Neb. 429, 434, 299 N.W.2d 520, 524 (1980).

We note that Garcia does not identify what evidence ought to have been offered with regard to either the letters of reference or the alternate suspects. However, we recognize that the discovery provided to counsel was alleged to be incomplete and thus conclude there may be evidence that was not provided to appellate counsel prior to this filing of Garcia's brief on appeal. As such, we conclude that we lack a sufficient record to determine the issue on direct appeal.

*(vi) Brief in Support of Motion in Limine*

Garcia alleges that his trial counsel was ineffective in failing to submit a brief in support of Garcia's second motion in limine. The record shows that Garcia filed this motion in limine specifically referencing 15 items that Garcia sought to prohibit the State from mentioning at trial. Garcia mentions only three items in his brief: The State should not have been permitted to (1) introduce any "post homicide behavior," including "travel, purchases, restaurants, casinos" as "immaterial, and irrelevant, and [as] likely [to] confuse the issues and mislead the jury"; (2) argue that "suicide [was an] acknowledgement and/or inference of guilt" due to Garcia's long history of depression; or (3) admit argument or evidence "indicating suspicions of law enforcement relating to uncharged crimes," where "law enforcement [might] believe [Garcia] planned to commit but where [crimes were] never actually committed." As such, we limit our consideration to these three.

Although Garcia's categories are perhaps less vague than those noted above regarding the searches of his vehicle, home, or employment records, we still find that Garcia has not sufficiently alleged what specific evidence counsel should have objected to and why. Without these specific allegations, we cannot determine whether the absence of a brief had any impact on the court's decisionmaking with regard to these categories. We conclude that Garcia has not adequately pled his ineffective assistance claim.

### (vii) Jury Instructions

Finally, Garcia alleges that his counsel was ineffective in failing to seek jury instructions clarifying the limited purpose for which the documents from his vehicle and home, as well as his employment records, were offered. But we have concluded above that Garcia has failed to sufficiently allege his allegations of ineffective assistance of counsel with regard to the admissibility of these documents and records. As such, it is immaterial whether the jury was given instructions as to its consideration of those records.

### (f) Conclusion

We find Garcia's assignments of error regarding the district court to be without merit. We further find that, except as set forth below, Garcia has failed to allege his claims of ineffective assistance of counsel with the required specificity with respect to the searches associated with his stop, arrest, and other warrants, as well as with respect to the documents relating to his time as a medical resident at Creighton. We find no prejudice with regard to the admittance of the LSU shoulder bag. Finally, we conclude that Garcia has sufficiently alleged deficient conduct regarding his bank card and the cell phone and tablet computer found in his vehicle when he was stopped, as well as regarding the May 25 warrant and discovery issues related to his *Franks* motion.

## 2. Testimony of Cecilia Hoffmann

### (a) Assignments of Error

Garcia assigns a number of assignments of error relating to Cecilia Hoffmann. He assigns, restated, that the trial court erred (1) by not granting a mistrial when the State violated a court order to not discuss a phone call between Hoffmann, Motta, and Steve Yahnke, who was a private investigator that worked for defense counsel; (2) by not allowing Garcia to play portions of a recorded interview between Hoffmann and Yahnke; and (3) by not inquiring about a conflict of interest

when Garcia's defense team continued as counsel after witness tampering allegations.

Garcia further assigns, restated, that his trial counsel was ineffective in (4) engaging in behavior akin to witness tampering during interactions with Hoffmann; (5) failing to adequately prepare for Hoffmann's testimony, including filing and preserving motions in limine to exclude testimony relating to allegations of witness tampering; (6) failing to object to the State's examination of Hoffmann wherein a question was asked again after an objection was sustained, where the State prematurely rehabilitated Hoffmann's testimony, and where the State had Hoffmann testify to an earlier consistent statement prior to Garcia's having impugned her motive to fabricate; (7) failing to call Hoffmann's coworkers to testify that law enforcement used leading interview techniques; (8) failing to make an offer of proof of a recorded interview so that it could be reviewed on direct appeal; (9) failing to reoffer the recorded interview to impeach Hoffmann's testimony during Garcia's case in chief; (10) failing to sequester Motta and Yahnke so that both could testify to impeach Hoffmann's testimony that she felt threatened by them; (11) failing, due to a conflict of interest, to call Motta and Yahnke to testify to impeach Hoffmann's testimony; (12) failing to object to the district court's allowing the State to impute consciousness of guilt and the weakness of the case from the defense to Garcia; (13) failing to withdraw as defense counsel following witness tampering allegations; (14) failing to consult with Garcia about the implications of the witness tampering allegations; (15) failing to pursue plea negotiations wherein Garcia could testify against Motta or Yahnke in exchange for leniency; (16) prioritizing publicity over Garcia's right to a fair trial by soliciting news outlets to cover the case; and (17) failing to secure Garcia's consent and a waiver of confidentiality and privilege before participating in a national news television show about the case.

### (b) Standard of Review and
### Propositions of Law

[16-18] A trial court is vested with considerable discretion in passing on motions for mistrial and for a new trial,[38] and an appellate court will not disturb a trial court's decision whether to grant a motion for mistrial or a motion for new trial unless the court has abused its discretion.[39] It is an abuse of discretion to make an error of law or clear errors of factual determination.[40] An appellate court's deference to the trial court stems in part from the recognition that the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the surrounding circumstances and atmosphere of the trial.[41] The trial judge has a special perspective on the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record.[42] The trial court is likewise in a better position to make credibility determinations of jurors' statements concerning whether they were influenced by extraneous information.[43]

### (c) Additional Background

Hoffmann was a dancer at a club located in Terre Haute, which club was frequented by Garcia. After Garcia was arrested in July 2013, OPD officers visited this club and spoke with Hoffmann. During those interviews, Hoffmann told law enforcement that Garcia had informed her that he had killed "an old lady and a kid."

Several years later, after Hoffmann's identity was released, Hoffmann was approached and interviewed by Yahnke.

---

[38] *State v. Trail*, 312 Neb. 843, 981 N.W.2d 269 (2022).

[39] *Id.*

[40] See *id.*

[41] *Id*.

[42] *Id*.

[43] *Id*.

During that interview, which occurred on or about June 3, 2015, Hoffmann was asked by Yahnke whether she would be willing to "recant [her] story" about Garcia's statement. During that interview, Hoffmann indicated that she would be willing to do so, though she "d[id]n't think [she] was lying" in her earlier statement to law enforcement. With prompting from Yahnke, Hoffmann suggested that due to her drug use at the time Garcia made his statement, she should "retract the statement." Hoffmann testified that she emailed Ryan Davis, the detective with the OPD who had initially interviewed her, about this incident while Yahnke was still at her home.

A portion of the conversation between Hoffmann and Yahnke was recorded. The recording was not admitted into evidence, nor was an offer of proof made with regard to the recording. A transcript of the recorded portion of this conversation is contained in our record.

Hoffmann, Motta, and Yahnke later spoke via telephone regarding Hoffmann's recantation. There was no recording or transcript of any part of this conversation, but Hoffmann later spoke to an officer of the Indiana State Patrol about both the interview and the phone call with Motta and Yahnke. According to the affidavit of the officer who conducted the interview of Hoffmann, Hoffmann related that Yahnke showed up at her home, presented a badge, and advised her that he was a detective. It was only after she allowed Yahnke into her home that she realized that he was working for Garcia; she had initially believed he was an OPD detective.

The officer's affidavit noted that Hoffmann had reported that Motta was aggressive, telling Hoffmann that she was a drug addict—and either did not remember what had happened or had heard the story elsewhere—and that people would not believe her. According to the affidavit, Hoffmann said that Motta and Yahnke convinced her that her testimony was not necessary for the case and that she would be "torn part on the stand given her background." Hoffmann then apparently informed the pair that she did not want her or her family

to have to go through a trial, but that she "stood firm" with what she heard Garcia say. According to Hoffmann, Motta then said: "'Honey, I would love for you to disappear.'" Motta asked Hoffmann to sign an affidavit recanting her statement, and Hoffmann agreed.

Hoffmann further indicated that Motta stated Garcia was innocent and that they would get him out, which frightened Hoffmann because she believed that since she gave a statement against Garcia, he might harm her and her family. Hoffmann further stated that Yahnke showed up at her place of work the next day and questioned her more about her statement.

In fact, Hoffmann never signed any affidavit retracting or recanting her statement about Garcia's admission, and at trial, she testified consistently with her initial statement. Hoffmann testified that she worked as a dancer at a club from about June 2012 to July 2013 and that in about November 2012, Garcia told her that he had killed "an old lady and a boy." Hoffmann testified that she thought Garcia was joking at the time he told her this and that she last saw Garcia at the club in February or March 2013.

Officers from OPD arrived at the club to speak to its employees in mid-July 2013. At that time, Hoffmann was aware that Garcia had been arrested. Hoffmann testified that she spoke to Davis and told him the story that Garcia had told her.

Hoffmann said she next spoke to Davis when her name was mentioned in court during pretrial proceedings. After her name was public, she and her family were subjected to media attention. Hoffmann specifically testified that "his lawyer was actually, like, Tweeting things about me."

Defense counsel objected to Hoffmann's testimony that "his lawyer" was "Tweeting" about her. At a sidebar and subsequent discussion in chambers, counsel argued over the extent to which Hoffmann could be questioned about whether she felt harassed or intimidated by Motta and Yahnke. Counsel for Garcia also sought to offer the recording of the conversation between Hoffmann and Yahnke and asked for

additional time to prepare for cross-examination, expressing surprise that Hoffmann had "re-change[d] her story back after the recantation."

The district court allowed additional time for Garcia to prepare for cross-examination, but declined to admit the recording, noting that Garcia could still impeach Hoffmann with statements made during that interview. At the conclusion of this discussion in chambers, Garcia made an oral motion in limine before the jury with the intent of limiting the State's ability to impeach Hoffmann given her recantation. That motion was denied.

The State then concluded its direct examination, at one point asking Hoffmann if she had told Davis everything that she had testified to in court. Though counsel for Garcia had expressed concern during the discussion in chambers that the State was attempting to bolster Hoffmann's credibility before she had been cross-examined, there was no objection to this question by Garcia.

After a break, Hoffmann's cross-examination began. Hoffmann was asked about her recollection of Garcia's statement and her drug use and was questioned about her interview with Yahnke. Garcia sought to refresh Hoffmann's recollection by having her listen, over headphones, to a portion of her interview with Yahnke. It was at this point that it was determined a partial transcript of that interview existed. There was some confusion about whether there was more than one version of a transcript available, with the State's noting, apparently within the hearing of the jury, that it had received a copy of a transcript of that interview from "their lawyer." Eventually, that transcript was provided to Hoffmann so that she might refresh her recollection of the conversation and cross-examination continued.

The State was then allowed redirect. Hoffmann testified that she felt harassed and intimidated by Yahnke. During redirect, Garcia sought a sidebar and again sought to offer

the recording. The court again refused to admit the recording, but held that any statements made by Motta were also inadmissible:

> We're talking about [Hoffmann's] recollection of the conversation with . . . Garcia. It's in. That's already been in. We're talking about whether somebody else interviewed her and tried to get her to change her statement. That's in. And she clearly is testifying, [h]e did try to get me to change that statement and I'm not changing it.
>
> . . . .
>
> And [Motta's actions took place] after [Yahnke's interview], so nothing changed.

On recross-examination, Garcia's counsel again questioned Hoffmann about whether she was really "terrified" by Yahnke. In response, Hoffmann mentioned the phone call with Yahnke and "your wife," referring to Motta. Counsel for Garcia objected. The objection was sustained over the State's argument that counsel had opened the door to the question. The State then asked, on further direct:

> Q. Did anybody else talk to you where you said, No that's not what I said; I know what I heard, when you were talking about what Garcia told you?
>
> A. Yes.
>
> Q. Who was that?
>
> A. It was his wife.
>
> [Defense counsel:] Objection. She [the State] went into the spoliation issue.
>
> [State:] No, I didn't.
>
> [Defense counsel:] Oh, you most certainly did.
>
> THE COURT: Yeah, the objection is sustained. The jury will disregard it.

### (d) District Court Error

#### (i) Mistrial

We turn first to Garcia's assertion on appeal that the district court erred in not granting a mistrial based upon the

State's reference to Hoffmann's phone call with Motta. Garcia focuses on three exchanges: first, a sidebar where the court ruled that the State could not inquire about the phone call between Hoffmann, Motta, and Yahnke; second, questioning of Hoffmann on further direct in which Hoffmann alluded to the phone call with Motta; and third, the reference to the transcript of the recorded portion of the Yahnke interview that was obtained from "their lawyer" and used during Hoffmann's testimony.

Specifically, Garcia notes the State was told that testimony about the phone call was inadmissible, but that it still questioned Hoffmann regarding the phone call and that this was compounded by the fact that the State had referenced "their attorney" in the presence of the jury, effectively letting the jury know that defense counsel had found it necessary to retain their own legal counsel. Garcia relies on *State v. Beeder*.[44]

In *Beeder*, the State indicated in closing arguments that the defendant's counsel had said, with reference to the third degree assault charge that the defendant stood accused of, that no defense would be put on, and then insinuated that the defendant had admitted to that charge. Following an objection, the jury was admonished to disregard the statement. Immediately thereafter, the State repeated essentially the same point—that the defendant offered no defense on that charge. Another objection and admonishment followed, and a motion for mistrial was denied. We reversed.

We find *Beeder* distinguishable on its facts. In *Beeder*, the statement went to the very essence of the charges against the defendant and suggested that he did not contest those charges. That is very different from here, where we have one comment by Hoffmann, which was not directly responsive to the question asked by the State. The comment was immediately

---

[44] *State v. Beeder*, 270 Neb. 799, 707 N.W.2d 790 (2006), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

objected to and an admonishment was immediately given. The jury was later instructed that it should not rely on any evidence that the court had ordered stricken.

Given the discretion granted to the district court, and that court's perspective of the issues in a case, we find no error in the district court's denial of Garcia's motion for mistrial.

### (ii) Refusal to Admit Audio of Yahnke
### Interview With Hoffmann

We turn to the court's refusal to admit the audio of the Yahnke interview with Hoffmann. Garcia sought to have the audio recording of the interview with Hoffmann entered into evidence to impeach Hoffmann's testimony that she was terrified by Yahnke and that he misled her about his employer. Garcia argues that Hoffmann's testimony was crucial to his convictions with respect to the 2008 murders and that "disproving her purported terror would significantly undermine her credibility by calling into question her motive to fabricate these points."[45]

Because the audio recording is not in the appellate record, we conclude that Garcia has waived any argument that the court erred in not admitting the audio recording. Consequently, we find this assignment of error without merit.

### (iii) Inquiring Into Conflict of Interest

Finally, Garcia assigns that the trial court erred in not inquiring into whether his counsel had an actual conflict of interest when continuing as defense counsel after the allegations of witness tampering were leveled against Motta and Yahnke. Garcia argues that his counsel had an actual conflict of interest insofar as counsel was in the position of representing Garcia while also maintaining an ongoing personal and professional relationship with Motta. Garcia further contended that the trial court had a duty to inquire into this conflict of interest.

---

[45] Brief for appellant at 200.

The Sixth Amendment guarantees the right to representation that is free from conflicts of interest.[46] To protect this right, a trial court must hold a hearing and inquire into a defense counsel's potential conflict of interest when the court knows or reasonably should know that a particular conflict exists, even in the absence of an objection.[47] And if a trial court had a duty to inquire because a potential conflict was apparent, an appellate court has discretion to consider the issue and remand a cause for a hearing into the matter. This is true even if the defendant did not raise the issue.[48] Also, a defendant can raise his or her attorney's conflict of interest for the first time on appeal if the defendant shows that an actual conflict existed and that it adversely affected the attorney's performance.[49]

At the time of the allegations, the State filed a motion for discovery and/or motion in limine seeking discovery of any information or recorded contact between Hoffmann, Motta, and Yahnke. A hearing was held on that motion. At that time, the State withdrew its motion. Though counsel for Motta appeared at that hearing, the hearing on the matter was brief, with the State's seeking either dismissal or withdrawal of the request. Other than seeking the sealing of the motion, which the State took no position on, there was virtually no discussion of the motion.

As noted above, a trial court has a duty to inquire when it knows or reasonably should know that a particular conflict exists. But our review of the record demonstrates that there was nothing in the motion or in the later withdrawal of the motion that would have put the court on notice that further inquiry was needed after the State withdrew its motion. As

---

[46] *State v. Bain*, 292 Neb. 398, 872 N.W.2d 777 (2016). See, also, *State v. Aldaco*, 271 Neb. 160, 710 N.W.2d 101 (2006).

[47] *State v. Bain, supra* note 46.

[48] *Id.*

[49] *Id.*

such, we find no error in the court's failure to conduct any
further inquiry.

### (e) Ineffective Assistance of Counsel

#### (i) Witness Tampering Allegations

We turn to Garcia's allegation that his counsel was ineffec-
tive in engaging in behavior akin to witness tampering during
interactions with Hoffmann. Garcia argues that it was deficient
conduct for counsel to have their investigator meet with a wit-
ness with the goal of securing the witness' recantation of an
earlier statement without maintaining a recording of the inter-
view and, moreover, to encourage the witness to recant even
after the witness indicated that the earlier statement was not
a lie.

We do not know the full extent of the conversations between
Hoffmann, Motta, and Yahnke because, as noted by Garcia, we
have only a written transcript of a partial audio recording, and
we lack testimony from Motta and Yahnke on the topic. Nor
does the record include testimony from Hoffmann about the
details of those conversations as they were subject to a motion
in limine. As such, we conclude that we lack a sufficient record
to determine this allegation on direct appeal.

#### (ii) Preparation for Hoffmann's Testimony

Garcia next assigns that counsel was ineffective in failing
to adequately prepare for Hoffmann's testimony. Specifically,
Garcia alleges that counsel was ineffective in seeking a motion
in limine, or in renewing his existing motions, to exclude tes-
timony relating to allegations of witness tampering by Motta
and the whole of the interview with Yahnke and that counsel
failed to adequately prepare for and anticipate the substance of
Hoffmann's testimony.

The record shows that one pretrial motion in limine regard-
ing Hoffmann was filed, seeking to exclude her testimony
altogether on the basis of a "lack of foundation" due to
Hoffmann's drug use and because of her "recant[ation] in a

recorded statement" made to Yahnke. That motion in limine was denied on the grounds that Hoffmann's purported recantation and drug and alcohol use went to the weight of that testimony. Thus, a motion in limine was sought and counsel was accordingly not deficient in that respect.

We also find no deficient conduct in counsel's failure to renew the motion in limine. We agree that both Hoffmann's possible recantation and her intoxication are relevant to the credibility of the statement and that her statement can be impeached on those grounds. But as we have held, such issues go to the weight of the evidence offered and not to the admissibility of that evidence.[50] Because the court did not err in its ruling on the motion in limine, counsel's failure to renew that motion or otherwise object was not deficient and counsel was not ineffective.

In addition to the written motion in limine, an oral motion in limine was sought and granted during trial with regard to the phone call between Hoffmann, Motta, and Yahnke regarding Hoffmann's possible recantation. Though Garcia argues on appeal that his counsel argued an incorrect basis for this motion in limine, the record shows that the court ultimately concluded the State was not permitted to elicit evidence regarding the phone call in question. And, as we discussed in more detail above, Hoffmann's response was not directly responsive to the question asked, but once given, counsel's objection to that answer was sustained and the jury was told to disregard the answer. Thus, counsel's conduct was not deficient and counsel was not ineffective.

Finally, Garcia contends that his counsel was ineffective in failing to adequately prepare for Hoffmann's testimony. Specifically, Garcia argues that counsel should have been aware that Hoffmann was planning to testify as to her original statement and had not recanted that statement. In addition, counsel should have been prepared to play excerpts from the

---

[50] See, e.g., *State v. Blackman*, 254 Neb. 941, 580 N.W.2d 546 (1998).

audio recording in order to impeach Hoffmann's testimony or have Motta testify to prove what Hoffmann disputed during her testimony.

We find no merit to the allegation that counsel was ineffective for failing to call Motta. Hoffmann was not permitted to testify about her interactions with Motta, only about those with Yahnke. Thus, Motta's testimony would have been inadmissible to rebut Hoffmann's. As such, we find no deficient conduct insofar as not calling or otherwise utilizing Motta's testimony.

We otherwise observe that we lack the record to determine these allegations on direct appeal. As we have noted above with respect to the district court's actions, the record does not include the audio recording of Yahnke's interview with Hoffmann, and thus, we lack the record to determine whether that evidence was admissible or whether counsel could have more effectively used it on cross-examination or otherwise been more prepared for Hoffmann's testimony.

### (iii) Counsel's Failure to Object During
### State's Questioning of Hoffmann

Garcia assigns that counsel was ineffective in failing to object to the State's examination of Hoffmann wherein a question was asked again after an objection was sustained, where the State prematurely rehabilitated Hoffmann's testimony, and where the State had Hoffmann testify to a prior consistent statement previous to Garcia's having impugned her motive to fabricate.

We turn first to the assertion that counsel was ineffective in failing to object when the State had Hoffmann testify to a prior consistent statement on direct examination and, relatedly, when the State prematurely rehabilitated Hoffmann's testimony. As relevant, the record shows that Hoffmann was asked, on two occasions near the conclusion of her direct examination, whether she had told officers the same thing that she had just testified to, and she answered affirmatively. In

addition, Hoffmann was asked whether the events that she had testified to occurred, and she answered that they had.

Trial counsel did not object at the time of any of these statements, though it did note during a sidebar that the State had been trying to rehabilitate Hoffmann's testimony prior to cross-examination, which was at a time prior to Garcia's having the opportunity to insinuate a motive or to fabricate an improper influence. Now on appeal, Garcia suggests that Hoffmann's two statements, as noted here, were hearsay and that the third was improper bolstering.

We find no deficient conduct insofar as counsel failed to object on hearsay grounds—having examined the statements, we do not find them to be hearsay statements. But we agree that all three statements amounted to the improper bolstering of Hoffmann on direct examination, which is not permitted by Neb. Rev. Stat. § 27-608(1)(b) (Reissue 2016). Section 27-608(1)(b) provides that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." As such, we find that trial counsel was arguably deficient in failing to object on those grounds.

We turn to whether Garcia was prejudiced by counsel's failure to object. We conclude that he was not. As we have noted, to show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[51] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[52] We cannot conclude that these three questions, asked in relatively quick succession, of just one witness, in a monthlong trial, was prejudicial.

Finally, we turn to whether counsel was ineffective in failing to object to the State's attempt, during Hoffmann's

---

[51] *State v. Mrza, supra* note 22.

[52] *Id.*

direct examination, to "loop[] the substance of the objected-to-hearsay into her follow-up question."[53] On direct, Hoffmann was asked a series of questions about her interview with Yahnke. This line of questioning was objected to on the basis of hearsay on more than one occasion, with Garcia's arguing essentially that the questions would lead to hearsay answers, even if the questions did not necessarily call for such an answer. The court overruled those objections.

Hoffmann continued to testify generally about her interaction with Yahnke, and then made the following statement: "But he kind of—he kind of gave me an out a little bit. He kind of said, [y]ou know, well, you—you could —." Garcia objected, and the court sustained the objection. The State then asked Hoffmann: "So . . . he kind of gave you an out. And did you go with that out[?]" Hoffmann replied that she did, noting that she was uncomfortable with Yahnke in her home.

Garcia now assigns that counsel erred in not objecting to the State's question about Hoffmann's taking Yahnke's "out" as hearsay and "loop[ing]" the prior answer, to which an objection had been sustained, into its followup question.[54]

We disagree that the statements complained of on appeal were hearsay and find no deficient conduct in failing to object. We understand the court to have been sustaining the objection to that portion of Hoffmann's answer that attempted to tell the jury what Yahnke had said—such an answer would have been hearsay and inadmissible.[55] But the part of the answer that was "looped" into the next question did not include hearsay or require a hearsay answer, but instead only asked Hoffmann to answer what she did in response to Yahnke's visit.[56] We find no ineffective assistance as to this allegation.

---

[53] Brief for appellant at 216.

[54] *Id.*

[55] See Neb. Rev. Stat. §§ 27-801 and 27-802 (Reissue 2016).

[56] Brief for appellant at 216.

### (iv) Failure to Call Hoffmann's Coworkers

Garcia contends that his counsel was ineffective for failing to call other dancers who would have testified that OPD used leading interview techniques "to Try to Persuade Them to Say That Garcia Confessed to Killing 'an Old Lady and a Little Kid.'" Garcia argues that the reason counsel sent Yahnke to interview Hoffmann was a report from other dancers that OPD was using leading interview techniques.

We first note that Hoffmann was asked on the stand about the interview techniques used by OPD during her interview, including whether OPD had suggested to those dancers that Garcia might have made such a statement to one or more of the dancers. Hoffmann denied that OPD used those tactics. Still, we understand Garcia to argue that the testimony of these other dancers regarding their interactions with OPD would undermine Hoffmann's credibility. And we cannot make this determination on the record on appeal; as such, we cannot decide this assignment of error on direct appeal.

### (v) Offer of Proof of Yahnke
### Interview With Hoffmann

We turn to Garcia's assertion that trial counsel was ineffective in failing to make an offer of proof of the recorded Yahnke interview with Hoffmann. He also asserts that counsel was ineffective in failing to reoffer that interview during Hoffmann's testimony. We have previously addressed this contention in connection with other assignments of error and reach the same conclusion here—we lack a record to determine on direct appeal whether counsel was ineffective with respect to their failure to make an offer of proof or to reoffer the recording. As such, we cannot reach this assignment of error on direct appeal.

### (vi) Remaining Allegations

Garcia assigns various allegations regarding the ineffectiveness of trial counsel due to a conflict of interest based on the witness tampering allegations. In particular, Garcia alleges

that his counsel was ineffective in failing to sequester or call both Motta and Yahnke as witnesses to rebut Hoffmann's testimony about her interactions with both of those individuals, in failing to object to the State's imputing consciousness of guilt from trial counsel to Garcia, in failing to withdraw as counsel once the witness tampering allegations arose, in failing to consult with Garcia about the implications of the witness tampering allegations, and in failing to pursue plea negotiations where Garcia could testify against Motta and Yahnke regarding the witness tampering allegations in exchange for leniency.

We conclude that we lack a record to determine whether Motta and Yahnke engaged in witness tampering and a record to determine whether there was any conflict of interest on the part of remaining counsel, or what effect that conflict might have had on Garcia's defense. For this reason, we do not consider the preceding assignments of error further.

### (vii) Counsel's Pursuit of News Coverage

Finally, we turn to Garcia's allegations that trial counsel was ineffective in pursuing news coverage, including a national news television show, in an attempt to prioritize their own interests and doing so without obtaining Garcia's consent. But we have no record to determine the scope of this news coverage, nor do we know for what purposes it was pursued or what consent or other notice might have been given to Garcia. As such, we cannot determine these final assignments of error on direct appeal.

### (f) Conclusion

We find no error with respect to actions by the district court. We also find no merit to Garcia's allegations that counsel was deficient in their handling of Garcia's motions in limine as relevant to Hoffmann's testimony, in failing to call Motta to testify, and in failing to object to Hoffmann's testimony as set forth above. We conclude that Garcia has sufficiently alleged, but we lack the record to determine, the

remainder of his ineffective assistance of counsel allegations regarding Hoffmann's testimony and the associated allegations of witness tampering.

### 3. Interlocutory Appeals

#### (a) Assignments of Error

On appeal, Garcia takes issue with two separate interlocutory appeals filed during the course of these proceedings. The first was filed by defense counsel in response to the failure of the district court to renew the pro hac vice status of Motta, who served as one of defense counsel prior to trial. As to this appeal, Garcia assigns, restated, that his trial counsel was ineffective (1) in pursuing interlocutory appeals on Garcia's behalf following Motta's loss of her pro hac vice status; (2) in pursuing an interlocutory appeal on Motta's behalf following her loss of pro hac vice status; (3) in supplanting their own judgment for Garcia's, in pursuing these appeals; (4) in not withdrawing as counsel after Garcia stopped talking to them as a result of the interlocutory appeals filed regarding Motta's pro hac vice status; and (5) in failing to consult with Garcia prior to pursuing the interlocutory appeal and in considering the wishes of Garcia's family over Garcia. In addition, Garcia assigns that the district court erred (6) by not inquiring about actual conflicts of interest when counsel continued to represent him after the pro hac vice appeals were filed.

The second appeal was filed by defense counsel after trial, but before the mitigation hearing, in response to the appointment of the Commission to serve as additional counsel. As to that appeal, Garcia assigns, again restated, that counsel erred (7) in pursuing an interlocutory appeal with respect to the district court's appointment of the Commission in order to prevent ineffective assistance of trial counsel on appeal, (8) in pursuing an interlocutory appeal in order to remain on the case to maintain leverage for payment of outstanding trial expenses, and (9) in pursuing an appeal to use it as a vehicle to continue to challenge the censure of Motta.

### (b) Appeal of Pro Hac Vice Denial

### (i) Additional Background

There were two appeals filed with this court on this issue: one filed by Garcia on April 21, 2016, in case No. A-16-409, relating to the withdrawal of prior local counsel and also regarding Motta's pro hac vice status, and a second filed on April 25, in case No. S-16-418, by Motta regarding her pro hac vice status. On April 29, Garcia wrote a letter to the district court that indicated he did not wish for Motta to be his attorney. That letter was forwarded to this court. Following the issuance of an order to show cause, we treated the letter as a motion to dismiss. As such, we dismissed both appeals on May 18.

### (ii) Pro Hac Vice and Related Allegations

We turn first to Garcia's allegations surrounding the appeals of the revocation of Motta's pro hac vice status. At the same time, we consider the related assignment that counsel was ineffective in supplanting their own judgment for Garcia's, considering the wishes of Garcia's family over Garcia's wishes, failing to consult with Garcia prior to pursuing the interlocutory appeal on Motta's pro hac vice status, and failing to withdraw as counsel when Garcia stopped communicating with them.

Having considered these allegations and the appellate record, we conclude that we cannot determine their merit on direct appeal. Our record does not include any evidence that would allow us to determine when or if Garcia indicated opposition to the filing of these appeals prior to the filing of the appeals or before the letter he wrote to the court on April 29, 2016. Nor do we have specific information about when, in relation to the filing of the appeals, counsel might have been informed of Garcia's wishes. The only evidence in the record besides Garcia's letter to the court was found not in the record of this case, but instead in a related case, and in questioning of Garcia where he indicated that he did not

want to appeal the denial of pro hac vice status, but instead wanted to move forward with his trial. In addition, the record is devoid of evidence concerning interactions between counsel and Garcia or Garcia's family. Because we lack a record to do so, we decline to reach these assignments of error on direct appeal.

### (c) District Court's Duty to Inquire

We turn to Garcia's assignment of error regarding the district court. He argues that the district court had a duty to inquire into whether trial counsel had an actual conflict of interest following the dismissal of the various appeals relating to Motta's pro hac vice status.

As noted above in our discussion of whether the court breached its duty to inquire after witness tampering allegations were made against Motta, a trial court has a duty to inquire when it knows or reasonably should know that a particular conflict exists.

We find that as to this allegation, the district court complied with its duty to inquire. The letter sent by Garcia that this court treated as a motion to dismiss clearly stated that he wished for all of his defense counsel to remain, except for Motta. When the various pro hac vice appeals were dismissed and proceedings recommenced in the district court, the court inquired of Garcia. At that time, Garcia suggested that he did not care who represented him and reiterated that he simply wanted to proceed to trial. Also at that time, the district court allowed argument into whether Garcia's capacity to choose counsel was diminished. After that argument, and accompanied by its own inquiry of Garcia, the district court concluded that any "diminished capacity" was a tactic and that he did not find competency to currently be at issue.

For these reasons, we conclude that the court complied with its duty to inquire and we find no error in the district court's failure to conduct further inquiry into possible conflicts of interest. There is no merit to this assignment of error.

### (d) Appeal of Appointment of Commission

We now turn to Garcia's allegations that counsel was ineffective in appealing from the appointment of the Commission as cocounsel prior to the mitigating circumstances hearing. Specifically, he argues that trial counsel did so to avoid having to raise ineffective assistance of trial counsel claims on direct appeal in an effort to maintain leverage for the payment of certain expenses of the appeal and in order to continue to challenge Motta's censure.

While Garcia points to some facts in the record that seem to support his assertions regarding the motivation to appeal the Commission's appointment, those assertions are nevertheless speculative. Moreover, we fail to see how on these facts Garcia was prejudiced by this appeal. As such, we find that this allegation is without merit.

### (e) Conclusion

We conclude that we lack a record to determine any of these allegations related to the first set of interlocutory appeals on the pro hac vice matters, which were sufficiently pled. But we find that Garcia cannot show that he was prejudiced by the filing of the appeal from the Commission's appointment, and as such, there is no merit to that allegation of ineffective assistance of counsel. Finally we find that the district court complied with its duty to inquire into whether defense counsel had an actual conflict of interest.

### 4. Motions to Sever

### (a) Assignments of Error

Garcia next argues several assignments of error relating to the joinder of the 2008 and 2013 homicide charges. Garcia assigns that the district court erred in finding that (1) these homicides were properly joined under Neb. Rev. Stat. § 29-2002 (Reissue 2016) and (2) a hearing under Neb. Rev. Stat. § 27-404 (Reissue 2016) was unnecessary because the charges had been joined.

Garcia further assigns, restated, that his trial counsel was ineffective (3) by failing to offer adequate evidence to support the prejudice prong of their motion to sever, (4) by failing to request a jury instruction that the jury was to keep the charges separate and come to a separate decision regarding each charge, (5) by failing to request a jury instruction that the jury was not to consider Garcia's purported admission to the 2008 charges when considering the 2013 charges, (6) by offering expert testimony regarding joinder when the issue is best determined by a fact finder, (7) by stipulating to the foundation and report of the State's expert on joinder, (8) by failing to vet the expert retained to offer his opinion regarding the motion to sever, (9) by introducing evidence regarding aggravating factors through the use of an expert on joinder, and (10) by wasting money on unqualified or unnecessary experts.

### (b) Standard of Review and Propositions of Law

[19] There is no constitutional right to a separate trial.[57] Instead, the joinder or separation of charges for trial is governed by § 29-2002, which states, in relevant part:

> (1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
>
> (2) The court may order two or more indictments, informations, or complaints, or any combination thereof, to be tried together if the offenses could have been joined in a single indictment, information, or complaint or if the defendants, if there is more than one, are alleged to have participated in the same act or transaction or in

---

[57] *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020).

the same series of acts or transactions constituting an offense or offenses. The procedure shall be the same as if the prosecution were under such single indictment, information, or complaint.

(3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint or by such joinder of offenses in separate indictments, informations, or complaints for trial together, the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires.

[20-23] Whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related so as to be joinable and (2) whether the joinder was prejudicial to the defendant.[58] There is a strong presumption against severing properly joined counts.[59] While § 29-2002 presents two separate questions, there is no error under either subsection (1) or subsection (3) if joinder was not prejudicial, and a denial of a motion to sever will be reversed only if clear prejudice and an abuse of discretion are shown.[60] An appellate court will find such an abuse only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice.[61]

[24,25] A defendant opposing joinder of charges has the burden of proving prejudice.[62] To carry that burden, a defendant must show compelling, specific, and actual prejudice from the court's refusal to grant the motion to sever.[63] Severe preju-

---

[58] *Id.*

[59] *Id*.

[60] *Id*.

[61] *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019).

[62] *Id.*

[63] *Id*.

dice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial.[64]

[26,27] Prejudice from joinder cannot be shown if evidence of one charge would have been admissible in a separate trial of another charge.[65] Additionally, joined charges do not usually result in prejudice if the evidence is sufficiently simple and distinct for the jury to easily separate evidence of the charges during deliberations.[66]

### (c) Additional Background

Garcia was charged by one information with a total of four counts of murder and one count of attempted burglary. Garcia filed a motion to sever, seeking three different trials—one for the Hunter/Sherman murders, one for the Brumback murders, and a third for the attempted burglary at the Bewtra home. The State and Garcia each presented evidence in the form of expert testimony regarding whether the cases were sufficiently linked to meet the standard for joinder. Following that hearing, the district court denied Garcia's motion to sever. In so ruling, the court noted that the experts' testimony offered an aid in making its findings, but that the question of joinder and severance was one of fact, and as such, it would have made the same decision without the experts' testimony.

### (d) District Court Error

#### (i) Sufficiently Related for Purposes of Joinder

We turn first to whether the crimes for which Garcia was charged were sufficiently related for purposes of joinder. We agree they were. As the district court noted, the victims were each connected to Creighton's pathology department,

---

[64] *Id.*

[65] *State v. Benson, supra* note 57.

[66] *Id.*

from which Garcia's employment had been terminated. And that termination had been central to Garcia's life experiences at various points, including just prior to the 2008 and 2013 murders.

The record further shows that the assailant in each charge gained access to the Hunter and Brumback homes, as well as attempted to gain access to the Bewtra home, without force. Nothing of value was taken from any crime scene. All four of the murder victims suffered similar knife wounds to the neck, causing similar injuries—though Roger Brumback's cause of death was a gunshot wound.

We reject Garcia's contention that only the State's theory ties these crimes together. As demonstrated by the commonalities noted above, this is not an accurate statement of the events of this case, and even if it were, we have previously considered the State's theory of prosecution as relevant to the question of joinder.[67] As such, we conclude that these cases were sufficiently related.

We note that Garcia does not challenge on appeal that he did not meet his burden to show that he would have been prejudiced by the joinder of these charges. For those reasons, we find no error in the district court's denial of Garcia's motion to sever.

### (ii) Hearing Under § 27-404(3)

In his second assignment of error, Garcia assigns that the district court erred in concluding that a hearing under § 27-404(3) was not necessary in order to determine whether the evidence from each crime scene would have been admissible in a separate trial of another charge. Garcia argues that "nothing in the joinder statutes alleviates the Court's responsibility to find by clear and convincing evidence that [Garcia] committed the other acts."[68] Garcia cites us to no authority

---

[67] See *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018).

[68] Brief for appellant at 281.

that affirmatively requires a hearing under § 27-404(3) under these circumstances.

But, as noted above, our case law provides that prejudice from joinder cannot be shown if evidence of one charge would have been admissible in a separate trial of another charge.[69] This court has previously engaged in such analysis, at an appellate level, of whether § 27-404 would operate to prohibit the admission of evidence of one charge in a trial of another charge.[70]

In conducting such an analysis now, we conclude that these separate charges would be admissible at trials on the other charges. As we noted, all four murders involved similar knife wounds, and all three crime scenes showed that little to no force was used to gain entry. Both of these factors are relevant to show the identity of the perpetrator. The victims all had a relationship to Creighton's pathology department, which relationship was relevant to show motive. And because these crimes are all charged by the information filed against Garcia, the State has a burden to show that all of those events occurred beyond a reasonable doubt.

There is no requirement for the court to hold a hearing under § 27-404, and in any case, the evidence from each crime scene would have been admissible in a separate trial of another charge. We find no merit to these assignments of error.

### (e) Ineffective Assistance of Counsel

#### (i) Failure to Offer Adequate Evidence as to Prejudice Prong

Garcia first assigns that his trial counsel was ineffective in failing to offer adequate evidence to show that he was prejudiced by the joinder of the three sets of charges. Garcia argues that he was prejudiced in several ways, as detailed below,

---

[69] *State v. Benson, supra* note 57.

[70] Cf. *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997).

and that his trial counsel was deficient in not raising these areas of prejudice before the trial court.

In his brief on appeal, Garcia asserts that he was prejudiced by joinder because (1) his purported admission to Hoffmann regarding the 2008 charges would have been inadmissible in a separate trial on the 2013 charges; (2) Motta's and Yahnke's purported tampering with Hoffmann's testimony "infected" that portion of his trial dealing with the 2013 murders[71]; (3) his testimony concerning why he was in Omaha in May 2013 was necessary to provide context, but he would be harmed by testifying in a trial on the 2008 charges; (4) the joinder of the cases allowed the State to introduce 16 years of prejudicial evidence without a hearing under § 27-404 or a finding that the evidence was inextricably intertwined; (5) the trial court failed to instruct the jury to disregard evidence inadmissible in the other case; (6) the trial court failed to instruct the jury that the evidence of each crime should be considered separately; (7) the trial court failed to instruct the jury that certain evidence was admitted for a limited purpose; and (8) had trial counsel been allowed to introduce evidence regarding alternative suspects and motives, the case would have been far more complicated.

Garcia first argues that his purported admission to the 2008 murders would have been inadmissible in a separate trial dealing with the 2013 murders, and he was therefore prejudiced by the denial of his motion to sever. But we concluded above that the evidence of the 2008 crimes would have been admissible in a separate trial on the 2013 events, and thus, we find no merit to this assertion.

Garcia next argues that the allegations regarding witness tampering as to the 2008 charges would infect that portion of the trial on the 2013 homicides. We disagree. The timing of these events does not factually allow such an "infection." Garcia filed the motion to sever charges, and after a hearing,

---

[71] Brief for appellant at 283.

the motion was denied, all at a time prior to the alleged witness tampering. Counsel could not have been ineffective for failing to raise that prejudice at the time of the motion to sever because the events allegedly causing said prejudice had not yet occurred. Additionally, though it is not raised by appellate counsel, we note that trial counsel did not renew Garcia's motion to sever in light of the alleged tampering. We find no merit to these assertions.

We turn to Garcia's assertion that he was prejudiced by the court's failure to sever the charges because he would have testified regarding the events of 2013 that brought him to Omaha, but would be harmed by testifying in a trial on the 2008 charges. He explains in his brief that he would have testified that

> in 2013 he was drinking heavily and was depressed. When he lived in Omaha, he had a casual acquaintance with whom he frequently shared adjacent bar stools at a particular bar in town. When he talked to this individual, it always made him feel better. At the time Garcia drove a lot for work and thus hopped in his car to drive to Omaha to seek counsel from his friend. However, when he arrived, he realized he could not find the bar, nor his friend, and decided to return home after getting food in the area where he thought the bar was located. He would also testify that he had searched for various addresses including those at issue because he was constantly submitting job applications and seeking references.[72]

Based on our review of the content of Garcia's explanation for being in Omaha at the time of the Brumback murders, we cannot find that defense counsel was deficient in failing to offer this in support of their argument that Garcia was prejudiced by the failure to sever the charges against him. In addition to being dubious that this testimony would have helped Garcia's defense, his explanation does not preclude

---

[72] *Id.* at 285.

his involvement in the 2013 murders, or otherwise entitle him to an alibi defense.[73] We find no merit in this allegation.

Garcia argues that he was prejudiced by the introduction of "16 years of prejudicial evidence including numerous behaviors that occurred after each of the crimes without a 404 hearing or an explicit finding [that] the evidence was inextricably intertwined," when the charges were not severed.[74] But, as we note above, a § 27-404 hearing was not required, and in any case, that analysis shows that the evidence of each crime would have been admissible in separate trials on the other charges. There is no merit to this assertion of prejudice.

Garcia next argues that he was prejudiced by the failure of counsel to seek jury instructions that the jury should keep the charges separate, that the jury should not consider Garcia's admission to the 2008 charges when considering the 2013 charges, and that the jury should be told that certain evidence was offered for only a limited purpose.

In analyzing this, we note our current framework—namely, what evidence should have been offered by counsel in an attempt to show that Garcia would be prejudiced by joinder. A jury instruction, when properly given, can limit prejudice. But the giving of a jury instruction is not evidence that a defendant can offer in an attempt to prove prejudice as a result of joinder. As such, we do not address this further here, but observe that Garcia separately assigns this failure as ineffective assistance of counsel, as noted below.

Garcia finally argues that he was prejudiced because if his trial counsel had been allowed to introduce evidence regarding alternative suspects and motives for each crime, each case would have been far more complicated. We first note that trial counsel was, in fact, permitted to offer some of this evidence of other suspects. To the extent the court failed to

---

[73] See *State v. El-Tabech*, 225 Neb. 395, 405 N.W.2d 585 (1987).

[74] Brief for appellant at 283.

admit certain evidence on other suspects, Garcia does not adequately argue that failure on appeal, and we need not address it here.

The test for joinder is ultimately similarity and prejudice. There is no prohibition to the joinder of cases simply because they might be more complicated if heard together. We find no merit to this allegation of prejudice.

### (ii) Failure to Request Certain
### Jury Instructions

Garcia assigns that his trial counsel was ineffective in failing to seek certain jury instructions: specifically, one that instructed the jury that it was to keep the charges against Garcia separate, and a second one to instruct that the jury was not to consider the 2008 purported admission of the Hunter/Sherman murders when considering the 2013 charges.

We find Garcia's contentions here are without merit. We have noted that these types of instructions may be considered in a determination of whether prejudice has resulted from joinder.[75] Still, while such an instruction simplifies the question of prejudice, it is not required in order for a court to find that a defendant was not prejudiced by the joinder of charges. We accordingly find no merit to Garcia's fourth and fifth assignments of error.

### (iii) Offering Expert Testimony at Joinder
### Hearing and Related Arguments

Garcia makes a number of assignments alleging the ineffective assistance of counsel with regard to the expert testimony offered at the hearing on the motion to sever. He assigns that his counsel was ineffective in offering unnecessary expert testimony, stipulating to the report by the State's expert, failing to vet his expert, introducing evidence regarding aggravating factors through use of the expert on joinder, and wasting money on expert witnesses.

---

[75] See *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014).

As the facts above note, expert testimony was offered by both the State and Garcia at the motion to sever, but the court indicated that such was unnecessary as the issue preserved a factual question which it, as the fact finder, was to make. The district court further noted that the testimony offered aided it in making its finding, but that it would have made the same decision regardless. Garcia does not challenge the court's assurance that it did not rely on the offered expert testimony in reaching its decision on the motion to sever. Thus, Garcia was not prejudiced by the offer of the expert testimony, the stipulation by his counsel to the State's expert's reports, or counsel's purported failure to vet the witness.

Garcia next argues that the expert offered evidence that went to the issue of aggravating factors and that counsel was ineffective for offering that evidence. But again, Garcia cannot show that he was prejudiced by this, as aggravating factors are determined by the jury, and this expert testimony was not presented to the jury.

Finally, Garcia argues that his counsel was ineffective in wasting money on expert witnesses, including the expert retained to testify as to the motion to sever. We conclude that even if counsel was deficient in spending funds on unnecessary witnesses, Garcia cannot show he was prejudiced by such deficiency.

### (f) Conclusion

We find no merit to any of Garcia's assertions as to error by the district court or ineffective assistance of counsel as to his motion to sever.

## 5. CHANGE OF VENUE AND JURY SEQUESTRATION

### (a) Assignments of Error

We turn to Garcia's arguments relating to various assignments of error about the jury, as well as his motion for a change of venue. As to the district court, Garcia alleges that

it erred in (1) failing to take adequate steps to prevent outside influence during the evidentiary portion of the trial.

Garcia also assigns, restated, various allegations of district court error and of ineffectiveness of trial counsel regarding his motion for a change of venue and for jury sequestration. Specifically, Garcia alleges that counsel was ineffective in (2) submitting inadequate evidence in support of the motion to change venue; (3) applying the wrong standard when selecting evidence to support their motion to change venue; (4) failing to investigate jurors' media exposure and biases through background investigation, individual voir dire, and supplemental jury questionnaires; (5) passing the jury for cause; (6) soliciting news coverage regarding the case insofar as it undermined, or even waived, Garcia's change of venue argument; (7) failing to submit adequate evidence in support of their motion to sequester the jury during trial; (8) failing to insist upon further inquiry of potential juror misconduct reported upon by defense counsel and by failing to seek a mistrial; and (9) entering the jury room during the trial.

### (b) Standard of Review

[28,29] Whether a jury is to be kept together before submission of the cause in a criminal trial is left to the discretion of the trial court.[76] To warrant reversal, denial of a motion to sequester the jury before submission of the cause must be shown to have prejudiced the defendant.[77]

[30] An appellate court reviews the denial of a motion to change venue for abuse of discretion.[78]

### (c) District Court Error

We turn to Garcia's argument that the district court erred in failing to take adequate steps to prevent the outside

---

[76] *State v. Oliveira-Coutinho*, 291 Neb. 294, 865 N.W.2d 740 (2015).

[77] *Id*.

[78] *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

influence of the jury during the evidentiary portion of the trial. Specifically, Garcia argues that the district court should have (1) admonished jurors that it was "their duty" to not listen to coverage or discuss the case, (2) properly questioned jurors about their exposure to outside information, and (3) confiscated jurors' cell phones during trial proceedings.

A review of the record shows that the jury was reminded before every recess at trial not to read or consume any media about the case or to discuss the case with anyone, including any other jurors. As such, we find no merit to Garcia's assertion that the court failed to inform the jury of "their duty" to not listen to coverage of or otherwise discuss the case.

As to the instance noted by appellate counsel wherein a member of the defense team entered the jury room and overheard what counsel believed may have been members of the jury discussing the case, the court immediately located those jurors and questioned them on the record, as well as all other jurors that might have been in the proximity at the time and found no juror misconduct. We are not aware of any other instances where Garcia alleges there was juror misconduct, let alone any misconduct that was not addressed by the court.

Finally, Garcia argues that the court should have confiscated jurors' cell phones for the duration of the trial, as he had requested. This request was made as part of his motion to sequester the jury for the duration of the trial, a request that was denied because the court concluded that at the time of the request, it was not impossible for Garcia to receive a fair trial based on pretrial publicity, the publicity was not biased against Garcia, and it was not possible to predict that future publicity would be biased against him. In short, the court acknowledged the publicity, but concluded that it was premature to conclude that Garcia could not receive a fair trial in Douglas County or that the jury needed to be sequestered for the duration of the trial.

We review both a motion for a change of venue[79] and one for the sequestration of the jury[80] for an abuse of discretion and find none. This assignment of error is without merit.

### (d) Ineffective Assistance of Counsel

#### (i) Venue and Sequestration

We turn now to Garcia's various allegations of ineffective assistance of counsel. Garcia's first set of allegations argues that his counsel was ineffective in failing to produce adequate evidence to support Garcia's motion to change venue and his motion to sequester the jury during trial, and that counsel did not understand or argue the relevant standard to determine whether venue should be changed. Relatedly, Garcia alleges that counsel was ineffective in soliciting news coverage regarding the case.

The record shows that counsel did file motions to change venue and sequester the jury, and thus, to this extent, counsel was not deficient. And indeed, the crux of Garcia's ineffective assistance of counsel allegations is not that counsel failed to seek such venue changes and sequestration, but that the evidence in support of such changes was both insufficient and premature.

Our review of the record shows that at the time of the motions, the trial court was fully aware of the media attention centered on this case. Thus, any failure of counsel to offer more evidence in support of those motions, even if deficient, was not prejudicial. The trial court's decision rested more on the prematurity of the motions, not on a lack of proof of the allegations.

In the same way, even if trial counsel was somehow deficient for failing to argue to the proper standard regarding venue and sequestration, as Garcia also assigns, that deficiency would not be prejudicial. It is apparent from the record

---

[79] See *id.*

[80] See *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005).

that the district court understood what it was being asked to determine and did not apply a standard designed to trap Garcia on these issues.

Ultimately, we understand Garcia's argument on appeal to primarily be that counsel was ineffective for not raising these motions at a more opportune time—such as closer to trial when the level of publicity and its impact on the trial could better be judged. Related to this issue is Garcia's assignment of error regarding the ineffectiveness of trial counsel in passing the jury for cause.

We briefly address the concept of passing the jury for cause. We suggested in *State v. McHenry*[81] that a defendant who challenged members of the venire on the basis that those individuals had been exposed to pretrial publicity waived his or her right to challenge those individuals on appeal when the defendant had passed the jury for cause. But thereafter, in *Rees v. State*,[82] we concluded that a party who unsuccessfully challenged a member of the venire and later passed the jury for cause suggests only that the party is ready to exercise its peremptory challenges without forfeiting the previously made cause objection. Now on appeal, Garcia contends that he assigns as ineffective his trial counsel's action in passing the jury for cause only insofar as he wishes to preserve his argument regarding change of venue. Accordingly, we consider this alongside such related assignments of error.

As to this limited issue, essentially whether trial counsel was ineffective in failing to renew his motions for a change of venue and sequestration, we lack the record on appeal to determine it. We also lack a record to determine on direct appeal Garcia's final allegation—that counsel was ineffective for soliciting news coverage of the case, thus contributing to the publicity around the case—which may have prejudiced him.

---

[81] *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995).

[82] *Rees v. State*, 252 Neb. 560, 563 N.W.2d 359 (1997).

### *(ii) Voir Dire*

We turn next to Garcia's allegations that counsel was ineffective in their handling of jury voir dire. Garcia alleges that counsel should have conducted more investigation into potential jurors, including sending out individual jury questionnaires, as well as supplemental jury questionnaires, and also should have conducted individual voir dire. Garcia also suggests that not enough investigation was done into the jurors' level of media exposure to the various aspects of this case.

We first note that allegations Garcia makes in his brief lack the particularity required and do not set forth precisely what trial counsel should have done differently and how trial counsel's actions were deficient.

[31] In addition, we have held that the law does not require that a juror be totally ignorant of the facts and issues involved; it is sufficient if the juror can lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court.[83]

We observe that the record at voir dire shows that the jury pool in this case was questioned, both in groups and individually, about the amount of media to which members had been exposed regarding the charges against Garcia. The record further shows that a sufficient number of the venire members either had limited to no exposure to media regarding the case or had indicated that they could put aside that prior exposure and consider only the evidence adduced at trial.

Thus, we conclude that these allegations either have not been sufficiently alleged or are affirmatively refuted by the record.

### *(iii) Juror Misconduct*

We turn to Garcia's allegations relating to juror misconduct. According to trial counsel, a member of the defense team overhead two jurors discussing a text message that one juror

---

[83] *State v. Gonzalez*, 313 Neb. 520, 985 N.W.2d 22 (2023); *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990). See, also, *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975).

received from her boss. Apparently, in the text message, the boss referenced media coverage wherein it was mentioned that one member of the jury looked bored, and the boss had asked this juror whether the media coverage was referring to her. This alleged misconduct was discovered when a member of Garcia's defense counsel team entered the jury room to empty a water glass in the sink located in that room and overheard the juror who received the text message discussing it with another juror. Counsel brought this conversation to the attention of the court, after which the jurors were identified and questioned in the presence of the State and defense counsel. After determining that no misconduct had occurred, the court reiterated the media warnings to the jurors in question, as well as to the jury at large. Counsel did not seek any additional relief at that time.

On appeal, Garcia now argues that trial counsel was ineffective in failing to insist that further inquiry into the above incident be made and was ineffective in failing to seek a mistrial as well.

We conclude that trial counsel's actions were not deficient. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[84] In determining whether trial counsel's performance was deficient, there is a strong presumption that counsel acted reasonably.[85]

Our record contains a transcript of the court's examination of these jurors. It shows that the concern raised by Garcia at the time of the alleged juror misconduct was that the jurors had read and were discussing media coverage of the case. Accordingly, the court questioned the jurors about the overheard conversation and was satisfied with the jurors' responses that neither had been reading media coverage

[84] *State v. Mrza, supra* note 22.

[85] *Id.*

of the trial. Based on our review of the record, we conclude that any counsel with ordinary training and skill would find that the trial court's examination of the jurors, in conjunction with the jurors' actions, adequately demonstrated that no misconduct had occurred. We find no merit to this assignment of error.

### (iv) Counsel Entering Jury Room

Garcia argues that his trial counsel was ineffective by entering the jury room during the trial. We disagree.

We assume without deciding that trial counsel's action in entering the jury room when it was occupied by members of the jury was deficient conduct. We certainly do not approve of the practice. But in our review of the record, we cannot conclude that Garcia was prejudiced by trial counsel's entry into the room. A hearing was held on the alleged juror misconduct that counsel witnessed while in the room, and thus, we have a contemporaneous record of counsel's actions. There is nothing in that record to suggest that counsel spoke with or otherwise interacted with the jurors in the room or that those jurors were even aware of counsel's presence in the room. There is no merit to this assignment of error.

### (e) Conclusion

We cannot determine on direct appeal whether counsel was ineffective in failing to renew Garcia's motions to sequester and for a change of venue, nor can we determine on this record whether counsel was deficient in their investigation of the jury and the voir dire process. Finally, we cannot determine whether counsel solicited news coverage. We otherwise find Garcia's assertions as discussed above to be without merit.

### 6. COMPETENCY

### (a) Assignments of Error

Garcia's competency was at issue at multiple points during these proceedings. As to the district court, Garcia assigns, restated, that the district court erred in (1) finding Garcia

competent to stand trial when the court was aware that Garcia had stopped communicating with defense counsel; (2) finding Garcia competent, without holding a full hearing on the third occasion of Garcia's competency being questioned; (3) not granting Garcia a new trial sua sponte when defense counsel filed an appeal, contrary to Garcia's wishes, regarding Motta's pro hac vice status; (4) refusing to reassess Garcia's competency when defense counsel filed an interlocutory appeal against Garcia's wishes and defended that appeal on the basis of Garcia's diminished capacity; (5) failing to directly inquire of Garcia regarding his symptoms after the symptoms were brought to the court's attention; and (6) failing to order another competency hearing after the presentation of mitigating evidence at his sentencing hearing.

In addition, Garcia assigns, restated, that trial counsel was ineffective in (7) failing to raise the issue of Garcia's competency at the time of his second competency hearing; (8) failing to seek a third competency evaluation when Garcia stopped communicating with counsel; (9) failing to object to the third competency evaluation by Klaus Hartmann of the Lincoln Regional Center (LRC), or seeking a continuance to review it; (10) unintentionally waiving Garcia's attorney-client privilege by providing letters to their competency expert to rely upon in forming his opinion; (11) failing to research the intersection of attorney-client privilege and competency as relating to Garcia's letters to counsel; (12) the handling of Garcia's "'Diminished Capacity'" because, in doing so, the defense lost credibility with the trial court and caused the trial court to view Garcia's condition as a "'Tactic'"; (13) insufficiently preparing for Garcia's competency hearings; and (14) failing to inform the district court at the point in time when Garcia stopped communicating with counsel.

### (b) Additional Background

Garcia's competency to stand trial was raised at several points throughout his prosecution. Garcia was charged in

August 2013. In February 2014, defense counsel reported concerns about Garcia's mental health and competency. The district court ordered Garcia to be admitted to the LRC for a competency evaluation. In May, following that evaluation and a hearing, Garcia was found to be competent. That finding was supported by the opinions of both Hartmann of the LRC and by an expert retained by the defense.

In August 2015, the issue of Garcia's competency was again raised after Garcia made allegations of sexual assault by correctional officers at the Douglas County Correctional Center. Those claims were investigated by the Douglas County Department of Corrections and were found to be unsubstantiated. Accompanying mental health evaluations were conducted by the Douglas County Department of Corrections, and it was suggested that Garcia may have been delusional. As such, Garcia was returned to the LRC for further evaluation.

In January 2016, a second hearing on Garcia's competency was held, at which Hartmann again testified that he did not find Garcia was delusional, suggested that Garcia was malingering, and ultimately found Garcia to be competent to stand trial. An expert retained by Garcia also testified that Garcia was competent to stand trial.

A few months later, in April 2016, Motta's pro hac vice status was revoked. Two appeals were then filed challenging that revocation, one by Motta and the other by Garcia, who also challenged other related decisions of the district court. Garcia wrote a letter to this court asserting that he did not wish to pursue these appeals, and this court accordingly dismissed them in May 2016. Trial followed in September and October 2016.

In February 2017, following his convictions, Garcia did not attend a hearing seeking payment from the county for certain expert witness fees. It is not entirely clear from the record, but it appears that Garcia did not attend the hearing, because the court did not feel his presence was necessary, and that his counsel was consulted and did not object.

However, before a hearing scheduled for March 7, 2017, it appears defense counsel and the court both anticipated that Garcia would refuse to attend. As such, the district court ordered that Garcia be read a statement informing him of his right to attend. A correctional officer testified that he had read the statement to Garcia and that he believed Garcia understood the statement.

Defense counsel, however, informed the court that Garcia currently refused to communicate with them and that he had apparently refused to do so for several months. As such, counsel was concerned about how a mitigation hearing would be conducted if Garcia refused to participate with them. The parties and the court discussed the possibility of a third competency evaluation, as well as forcibly requiring Garcia to come before the court for questioning. The district court commented that other evidence suggested Garcia was making a choice to not communicate with his counsel.

Another hearing was held March 13, 2017, and Garcia was forcibly required to attend. Garcia did not respond to questioning from the court during that hearing. The State offered prison communications written by Garcia to prison officials from December 2016 to February 2017 and maintained there was no suggestion that Garcia was incompetent or mentally unwell. Ultimately, the court ordered a third competency evaluation and Hartmann was ordered to update his prior competency evaluations. Hartmann did so and found that in his opinion, Garcia continued to be competent.

Following a hearing on March 24, 2017, the court found Garcia competent for sentencing.

### (c) Standard of Review and Propositions of Law

[32-36] The question of competency to stand trial is one of fact to be determined by the district court.[86] A court's

---

[86] *State v. Surber*, 311 Neb. 320, 972 N.W.2d 64 (2022).

decision regarding competency will not be disturbed absent insufficient evidence to support that finding.[87] A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense.[88] The competency standard includes both (1) whether the defendant has a rational as well as factual understanding of the proceedings against him or her and (2) whether the defendant has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding.[89] There are no fixed or immutable signs of incompetence, and a defendant can meet the modest aim of legal competency, despite paranoia, emotional disorders, unstable mental conditions, and suicidal tendencies.[90]

### (d) District Court Error

On appeal, Garcia assigns seven errors regarding competency and related issues to the trial court.

Garcia first argues that the trial court committed plain error in finding him competent to stand trial when the court was aware that he had stopped communicating with defense counsel. But our review of the record suggests that the district court was not informed that Garcia had stopped communicating with his counsel until the March 7, 2017, hearing, which was after the trial. As soon as the court was informed, it ordered an updated competency evaluation. The district court did not plainly err in finding Garcia competent at a specific point in time where defense counsel failed to alert it to Garcia's lack of communication.

---

[87] See *id.*

[88] *Id.*

[89] *Id.*

[90] *Id.*

For the same basic reasons, we decline to find that the district court erred in not sua sponte granting Garcia a new trial at the time that defense counsel appealed from the revocation of Motta's pro hac vice status, as Garcia alleges in his third assignment of error. This argument presupposes that the trial court was aware not only that Garcia was no longer speaking to defense counsel, but also that this lack of communication began at the time the appeal regarding Motta's pro hac vice status was filed. But the court did not discover anything regarding this lack of communication until the March 7, 2017, hearing, well after that appeal was filed and dismissed and trial was held, ending with Garcia's convictions.

Garcia also argues that the district court erred in determining that he was competent without a full hearing on the third occasion of determining his competency in March 2017. On this occasion, Garcia's counsel had, on March 7, brought the issue of Garcia's competency to the attention of the State and the district court. The court accordingly requested that Hartmann update his report regarding Garcia's competency.

Another hearing was held on March 24, 2017. The updated report was sent to defense counsel, though likely just prior to this hearing. Despite this, defense counsel indicated that the report had been received, that they were aware of Hartmann's opinion regarding competency, and that this opinion would be in line with Hartmann's prior reports. Counsel did not object to the admission of the report.

At a hearing a few days later, counsel for Garcia sought the opportunity to cross-examine Hartmann on the contents of this report. The request was denied on the basis that Hartmann's report had not been objected to at the earlier hearing. We agree with the district court that the failure to object to Hartmann's report at the March 24, 2017, hearing waived any objection to that hearing and waived any right to cross-examine Hartmann as the author of that report.[91] We find no merit to Garcia's

---

[91] See *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020).

assertion that the trial court erred in the manner in which it conducted the March 24 hearing.

Garcia next argues that the district court erred when it did not reassess his competency after his counsel filed a second interlocutory appeal regarding the appointment of the Commission and defended it on the basis of Garcia's diminished capacity. This appeal was filed on April 27, 2017, approximately a month after the court's March 24 holding that Garcia was competent. Our review of the record shows no demonstrated difference in Garcia's behavior or manner in the time from the March 24 finding of competency until the April 27 appeal of the appointment of the Commission. Given that the district court had approximately a month earlier decided that Garcia was competent based on an updated evaluation, and based further on the fact that no change to Garcia's behaviors had been reported to the court in that time period, it was not error for the court to determine that Garcia continued to be competent to stand trial at the time of the second interlocutory appeal.

Garcia also contends that the district court erred in not inquiring directly of him in 2014 after trial counsel continued to raise Garcia's ongoing mental health symptoms. We also find no error in this. Garcia is correct that the court declined to make such an inquiry. However, the record shows that immediately after indicating that it would not inquire of Garcia because it did not find that to be appropriate, the district court ordered a competency evaluation of Garcia. The court did not err in declining to question Garcia as to his mental health and in instead ordering that Garcia be examined by a medical professional as to that issue. There is no merit to this assignment of error.

Finally, Garcia assigns that the district court erred in not ordering a fourth competency hearing after the mitigation hearing at which evidence of Garcia's history of

psychological treatment was offered. We find this to be without merit. While Garcia offered the evidence of his mental health history through his own witnesses, the State also offered Hartmann's testimony on the topic of Garcia's treatment and various mental health evaluations while in prison awaiting trial. The court was free to make its own factual determinations regarding the weight to assign the testimony of those witnesses.[92] Moreover, the mental health history may be relevant to Garcia's competency, but it is not dispositive. We are concerned, not with the status of Garcia's mental health in the past, but its status at the time of trial or, as here, his sentencing.[93] There is no merit to this final assignment of district court error regarding Garcia's competency.

### (e) Ineffective Assistance of Counsel

Garcia assigns that trial counsel was ineffective in (15) failing to raise the issue of Garcia's competency at the time of his second competency hearing; (16) failing to seek a third competency evaluation when Garcia stopped communicating with counsel; (17) failing to object to Hartmann's third competency evaluation or seeking a continuance to review it; (18) unintentionally waiving Garcia's attorney-client privilege by providing letters to expert witness Stephen Peterson to rely upon in forming his opinion; (19) failing to research the intersection of attorney-client privilege in competency as related to Garcia's letters to counsel; (20) handling Garcia's "'Diminished Capacity'" because in doing so, the defense lost credibility with the trial court and caused the trial court to view Garcia's condition as a "'Tactic'"; (21) failing to inform the district court at the point when Garcia stopped communicating with counsel; and (22) insufficiently preparing for Garcia's competency hearing.

---

[92] See *State v. Surber, supra* note 86.

[93] See *State v. Guatney*, 207 Neb. 501, 299 N.W.2d 538 (1980).

### (i) Failure to Raise Competency Prior
### to Second Competency Hearing

Garcia first argues that his counsel was ineffective in failing to raise the issue of his competency prior to the second competency hearing. He argues that counsel should have known he was not competent based upon the allegations he made about being sexually assaulted. However, Garcia cannot show that he was prejudiced by this alleged deficient conduct. The State brought the issue to the attention of the court, and a second competency evaluation was sought, in part, due to these same allegations of sexual assault, although this time by machines, as well as mind control allegations, and the opinion of a psychiatrist at the Douglas County Department of Corrections that Garcia might be delusional.

### (ii) Failure to Seek Third
### Competency Hearing

Garcia contends that his counsel was ineffective in failing to seek a third competency hearing when he stopped communicating with his counsel prior to trial. This lack of communication was eventually brought to the attention of the court after trial and before Garcia's mitigation hearing. At that time, a competency evaluation was attempted. Due to Garcia's lack of cooperation, the doctors at the LRC could determine only that Garcia's condition was consistent with his condition at the time of the second evaluation. The competency report was updated accordingly, but with the same finding of competency. Accordingly, the court found that Garcia was competent at that time.

Because an evaluation was done with respect to Garcia's failure to communicate, and because it was determined that he was competent, we conclude that this assertion is without merit.

### (iii) Failure to Object to Hartmann's Report
### on Third Competency Evaluation

Garcia argues that his counsel was ineffective in failing to object to Hartmann's third competency evaluation or, at a

minimum, to seek a continuance to review the results of that evaluation and that counsel further erred in not objecting to the admission of that competency report.

The crux of Garcia's argument is that he had insufficient notice the district court was going to proceed on the issue of competency at the March 24, 2017, hearing and that thus, his counsel did not have adequate time to prepare to cross-examine the State's expert, challenge the State's report, or present their own expert. That trial counsel lacked notice was particularly evident when, at a hearing held less than a week later, counsel sought an independent evaluation of Garcia's competency but was denied. Garcia argues that counsel ought to have identified the lack of notice at the March 24 hearing and, at a minimum, requested a continuance to review the matter.

There is a strong presumption that counsel acted reasonably, and we will not second-guess reasonable strategic decisions.[94] Moreover, trial counsel is afforded due deference to formulate trial strategy and tactics.[95] Having considered Garcia's allegations, given our deference to trial counsel, as well as the presumption that counsel has acted reasonably, we cannot find that counsel's failure to object was deficient. As such, we find no ineffective assistance of counsel.

### (iv) Waiver of Attorney-Client Privilege on Garcia's Letters to Counsel

Garcia next argues that counsel was ineffective in waiving his attorney-client privilege with regard to letters written from Garcia to counsel. In sum, Garcia wrote letters to counsel that were unintelligible, and counsel provided those letters to their expert at the time of the second competency hearing.

Upon learning about the letters, the State argued that Garcia's attorney-client privilege had been waived and that it should be permitted to review the letters. But the court

---

[94] *State v. Anders, supra* note 25.

[95] *Id.*

denied the State's request, and there is no indication that the court even reviewed the letters. Instead, the court concluded that the letters were collateral to the issue of Garcia's competency in that both the State's expert and Garcia's expert agreed that Garcia was competent.

We find no merit to Garcia's assignment of error. Garcia cannot show that he was prejudiced by the actions of his counsel in providing the letters to their expert when the letters were not given to the State or reviewed by the court. Similarly, Garcia's argument that he was prejudiced by the alleged failure of counsel to research the attorney-client privilege as to this topic is also without merit because Garcia cannot show that the documents were ever provided to the State.

### (v) Counsel's Handling of Garcia's "Diminished Capacity"

Garcia also assigns that counsel erred in their handling of his "diminished capacity." The basis of Garcia's argument is not entirely clear, but it appears to be related to the filing by counsel of the interlocutory appeal regarding the denial of Motta's pro hac vice status. In his brief, Garcia notes that defense counsel rationalized this appeal by reference to Garcia's diminished capacity and that over time, this argument caused counsel to lose credibility with the district court and made the court view Garcia's competency issues as a "tactic." We find that allegation to be without merit. We have reviewed the record that demonstrates the district court engaged in its own investigation into Garcia's mental state at all relevant times and was not swayed by any assertion by defense counsel regarding any diminished capacity.

### (vi) Failure to Prepare for Competency Hearings

Finally, Garcia argues that his counsel was ineffective in their preparation for his competency hearings. We find this allegation to be conclusory in nature and without merit.

### (f) Conclusion

We find no error in the district court's handling of the issues surrounding Garcia's competency, nor do we find ineffective assistance of trial counsel.

### 7. Discovery

### (a) Assignments of Error

We turn to allegations relating to the discovery process in this case. Garcia assigns that trial counsel was ineffective in (1) submitting inadequate evidence in support of allegations of violations of *Brady v. Maryland*[96], (2) failing to adequately document the discovery process in order to preserve Garcia's *Brady* allegations, (3) failing to fully cooperate with successor counsel, and (4) proceeding with a significant pretrial evidentiary hearing telephonically without Garcia present. Relatedly, Garcia assigns that the trial court erred in (5) holding the significant pretrial evidentiary hearing telephonically and without Garcia or Nebraska counsel present.

### (b) Additional Background

Garcia asserts error related to his *Brady* motion. That motion, filed August 3, 2015, and heard on August 7, is entitled "Combined Motion to Vacate Protective Order and Brady Motion for Production of All Discovery." It appears from the record that neither Garcia nor local counsel was present at this hearing and that the hearing occurred telephonically.

At issue was Garcia's access to information related to the 2007 murder of Joy Blanchard in Omaha. The motion alleged that counsel had reviewed a "limited amount of discovery related to" Blanchard's murder, that the crimes were similar, and that Garcia was not linked to the Blanchard murder. As such, the motion alleged that the Blanchard evidence suggested there might be a connection to the Hunter/Sherman murders, which evidence may have exculpated Garcia. The

---

[96] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

motion sought the lifting of the protective order on the evidence and a fuller review of the Blanchard discovery.

A hearing was held. At that hearing, the State argued that some of the evidence sought "aren't ours to give; they're the City of Omaha's," because it was an open police investigation and not a pending case with the Douglas County Attorney. The State further argued that the material was not *Brady* material.

Garcia's counsel argued to the contrary, outlining the similarities between the Blanchard murder and the 2008 Hunter/Sherman murders. During the hearing, Garcia's counsel initially argued and made what they termed "an offer of proof," and they sought judicial notice of certain prior evidence in an apparent attempt to show the similarities between the Blanchard murder and the Hunter/Sherman murders. The State suggested that "an offer of proof" was not evidence. Eventually, the information that Garcia's counsel had reviewed was made part of the record and the court also agreed to take judicial notice of the testimony of certain prior witnesses.

Following the hearing, the court denied the motion to vacate the protective order but granted Garcia access to the discovery sought in the motion. In the months leading up to trial, Garcia indicated that some of this evidence would be utilized by him at trial. The record reflects that several witnesses were asked at trial about the Blanchard case and that Blanchard's boyfriend testified at trial regarding the crime scene. Some photographs of that scene were also offered at trial. It appears the only substantive limitation set on Garcia was that he was not permitted, due to a lack of evidence, to connect Sherman's son-in-law to the Blanchard murder.

### (c) Evidence of *Brady* Violations

We turn first to Garcia's assignment of error alleging that his counsel was ineffective in "Submitting Inadequate Evidence to Support" his *Brady* violations. Our review of that hearing shows a motion was made and argued and evidence was

offered. At the conclusion of the hearing, Garcia's motion was granted and the State was ordered to provide the requested discovery. At least some of that material was offered in Garcia's defense at trial. Trial counsel could not have been ineffective in obtaining the result that appellate counsel now, inexplicably, argues was not reached.

### (d) Discovery Process

While Garcia was ultimately successful as to this *Brady* motion, we understand him to also be arguing in his second and third assignments of error that his trial counsel's procedure in documenting the discovery process was deficient and that counsel was accordingly ineffective. Garcia suggests that trial counsel was unaware of what discovery had been received or included initially, and then was uncooperative in sharing that discovery with successor counsel.

In short, Garcia contends that the state of the discovery provided to successor counsel from trial counsel was disorganized and potentially incomplete and that thus, it was not possible for appellate counsel to determine all instances of trial counsel's ineffectiveness regarding discovery in general. Garcia does not allege that the State failed to turn over the discovery, but, rather, he suggests that it is not possible, given the current state of the record of trial counsel, for appellate counsel to definitively know, and therefore preserve, all potential issues of ineffective assistance of counsel. We lack a record to conclude whether appellate counsel had a sufficient record, and thus, we cannot determine this issue on direct appeal.

We conclude that as to these broader assignments of error, we lack a sufficient record to determine the issue on direct appeal.

### (e) Telephonic Hearing Absent
### Garcia and Local Counsel

We turn to the assertion that the district court erred in holding a significant pretrial evidentiary hearing by phone and without Garcia or Nebraska counsel present and that

counsel was ineffective in failing to object. Garcia is referring to the hearing as detailed above. We agree that Nebraska counsel was absent and that the hearing was held telephonically. Moreover, we agree that trial counsel did not object to the holding of the hearing. Given the lack of objection, we find any error as to the district court has been waived and we proceed to analyze this issue only as an ineffective assistance of trial counsel claim.

We turn to Garcia's allegation that the absence of Nebraska counsel amounts to structural error. Garcia cites to no authority that would support the conclusion on these facts that local counsel's absence was structural error.

In fact, we find that it was not error at all. Pro hac vice admission in Nebraska is governed by Neb. Ct. R. § 3-122 (rev. 2019). It provides, as relevant, that "[t]he associating attorney . . . shall . . . personally appear at all proceedings before the court, unless excused by the court."[97] And here, the record is clear that the district court was aware of Nebraska counsel's absence and allowed the proceedings to continue despite that absence. As such, local counsel's personal appearance was excused by the court and trial counsel was not ineffective.

We next consider the allegation that the hearing was telephonic and not open to the public. We likewise find no error. Nebraska statute provides in part that "[t]he judge, in his or her discretion, may in any proceeding authorized by the provisions of this section not involving testimony of witnesses by oral examination, use telephonic, videoconferencing, or similar methods to conduct such proceedings."[98] The record shows that no witnesses testified at this hearing. Moreover, we note that the topic of this hearing was sensitive—involving a protective order regarding evidence relating to the Blanchard

---

[97] § 3-122(E).

[98] Neb. Rev. Stat. § 24-734(3) (Reissue 2016). See, also, Neb. Rev. Stat. § 24-303 (Reissue 2016).

murder. As such, we find no abuse of the trial court's discretion in holding the hearing telephonically and, in turn, no ineffective assistance by trial counsel.

Finally, we turn to Garcia's alleged absence. We cannot tell for certain that Garcia was not in attendance—in the transcription of other hearings, the court reporter explicitly states that Garcia either was present or was not present, but for this hearing, the record is silent. And if Garcia was not present, we have no information about why he was not present or what precipitated his absence.

Garcia notes that he was prejudiced by not attending this hearing because, at this hearing, one of his attorneys had a "temper tantrum" that Garcia was unaware of.[99] Having reviewed the record, we do not disagree with this characterization of the attorney's behavior. As such, we determine that our record is insufficient to decide this allegation on direct appeal.

### (f) Conclusion

We find no merit to Garcia's allegations regarding the adequacy of the evidence offered on his *Brady* motion and his allegation that a hearing proceeded telephonically and in the absence of local counsel. We find that we lack the record to determine on direct appeal Garcia's allegation that he should have attended the telephonic hearing and his allegation regarding the state of discovery provided to appellate counsel.

### 8. DNA and Digital Evidence

### (a) DNA Evidence

Garcia makes several assignments of error relating to the DNA evidence presented at trial, which assignments we consolidate. He alleges that trial counsel was ineffective in (1) failing to challenge the admissibility of the State's DNA

---

[99] Brief for appellant at 377.

evidence as derived from unreliable methodology under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[100]; (2) failing to prepare to cross-examine and also adequately and effectively cross-examine the State's DNA experts during pretrial hearings; (3) failing to present DNA expert testimony at pretrial hearings, as well as at trial, regarding the unreliability of "Suspect-Centric Mixture Analysis"; (4) failing to effectively cross-examine the State's expert at trial regarding the use and unreliability of "Suspect-Centric Mixture Analysis"; (5) failing to adequately prepare, understand, and cross-examine trial witnesses regarding DNA; and (6) stipulating to the credentials of the State's DNA expert.

Though Garcia assigns several points of error, they all relate to the ineffectiveness of trial counsel in their preparation and implementation of Garcia's defense regarding the State's evidence that his DNA was found on the handle of Bewtra's back door. We find such allegations conclusory and thus insufficient to raise a challenge to the effectiveness of counsel.

### (b) Digital Evidence

Garcia also assigns that his trial counsel was ineffective in (7) retaining an unqualified digital forensic expert and (8) failing to research and adequately prepare to cross-examine the State's digital forensic expert.

As with the DNA evidence, we conclude that the allegations made by Garcia in his brief are conclusory and not sufficient to raise an allegation of ineffective assistance of counsel.

We note that, elsewhere in his brief, Garcia also suggests that counsel was ineffective in "Wasting" money on an unqualified digital evidence expert. To the extent that this argument was raised, we conclude that Garcia cannot show that he was prejudiced by the expenditure of such funds.

---

[100] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

## (c) Conclusion

We find that with respect to Garcia's allegations on DNA and digital evidence, Garcia has failed to allege a claim of ineffective assistance of counsel with sufficient specificity. To the extent Garcia could be read to argue that counsel "Wast[ed]" funds in their retention of a digital evidence witness, we find that Garcia cannot demonstrate prejudice.

## 9. MISCELLANEOUS ALLEGATIONS OF INEFFECTIVE ASSISTANCE OF COUNSEL

Garcia assigns that his trial counsel was ineffective in failing to request an alibi instruction. In addition, Garcia assigns multiple allegations of ineffectiveness of trial counsel, which he contends cannot be addressed on direct appeal: that trial counsel was ineffective in (1) failing to discuss the State's plea offer with Garcia, (2) failing to discuss with Garcia his right to testify, (3) failing to adequately prepare for trial, (4) failing to explain to Garcia his options relating to an insanity defense, (5) failing to explain to Garcia the problems regarding the evidence in this case, (6) failing to offer evidence of alternative suspects, (7) failing to effectively cross-examine the Dundee neighborhood identification witnesses in the Hunter/Sherman murders, and (8) pressuring Garcia to waive his speedy trial rights.

## (a) Alibi Instruction

We turn first to Garcia's allegations regarding counsel's failure to seek an alibi instruction. Garcia acknowledges that a proposed instruction was not requested from the trial court. He argues that this was deficient conduct and prejudicial because the alibi instruction was warranted by the evidence. We find this allegation to be without merit.

We note that though Garcia argues that he was entitled to an alibi instruction, he does not explicitly explain what evidence might support such an instruction. From our review of the record, it appears Garcia would be relying on evidence from

his time in Des Moines, Iowa, in the evening hours of May 12, 2013. The record shows that a few hours after Garcia's location data indicated he was in Omaha, that data showed that he had left Omaha and was near Des Moines. A hotel clerk testified that she remembered Garcia's checking into the hotel and that she later saw him at the hotel with an unidentified woman. Presumably, both of these witnesses are the alibi to which Garcia refers.

[37,38] In order to justify an alibi instruction, there must be evidence that the defendant was at some other place during the commission of the crime.[101] In addition, the evidence must show that the defendant was at such other place for a length of time that it was impossible for him or her to have been at the place where the crime was committed, either before or after the time he or she was at such other place.[102] While the record shows that Garcia might have been in Des Moines around the time of the Brumback murders, it does not show that it was impossible for Garcia to have been in Omaha and at the Brumback home for all of the time period at issue.

Rather, the evidence shows that the Brumbacks were killed sometime between 2:40 p.m. on May 12, 2013, and 9:40 a.m. on May 14, but most likely sometime on May 12. Garcia's phone records show a call was received on his cell phone at approximately 5:15 p.m. on May 12 that "pinged" off a tower in Atlantic, Iowa, about an hour east of Omaha. Evidence further shows that Garcia was in the area of West Des Moines, Iowa, approximately 2 hours from Omaha, by approximately 7 p.m. Thus, Garcia's alibi does not show that he was somewhere else for a length of time making it impossible for him to have committed the crime.

We find no merit to this allegation of ineffective assistance of counsel.

---

[101] See *State v. El-Tabech, supra* note 73. See, also, *State v. Cobos*, 22 Neb. App. 887, 863 N.W.2d 833 (2015).

[102] *Id.*

#### (b) Miscellaneous Allegations of Ineffective Assistance of Counsel

We turn to Garcia's various allegations of ineffective assistance of counsel that Garcia claims cannot be reached on direct appeal. We agree with Garcia that we lack a sufficient record to determine whether trial counsel (1) failed to discuss the State's plea offer with Garcia, (2) failed to discuss with Garcia his right to testify, (3) failed to adequately prepare for trial, (4) failed to explain to Garcia his options relating to an insanity defense, (5) failed to explain to Garcia the problems regarding the evidence in this case, and (6) pressured Garcia to waive his speedy trial rights.

This leaves the allegations that trial counsel was ineffective in failing to investigate and properly present evidence of alternate suspects and in failing to effectively cross-examine the Dundee identification witnesses. We turn to the alternate suspects.

#### (i) Alternate Suspects

At trial, trial counsel attempted to introduce evidence of other potential suspects. We note that in the argument on this assignment of error, counsel does not identify these "Alternate Suspects," suggesting that that failure might be due to lack of access to trial discovery. Though Garcia does not name any of these "Alternate Suspects," we note that evidence about other Creighton medical residents and Sherman's son-in-law was admitted at trial. In addition, certain evidence about the murder of Blanchard, which occurred near the time of the Hunter/Sherman murders, was offered.

Now on direct appeal, Garcia contends the trial court "restricted much of their ability to introduce a coherent picture of these suspects largely because [trial counsel] struggled to articulate the evidence in the relevant terms the Court requested" and that trial counsel was ineffective for failing to present a coherent picture of these alternate suspects so that the district court could allow the defense to introduce

that evidence.[103] But Garcia suggests that "this issue cannot be addressed without further investigation and an evidentiary hearing because successor counsel, too, lacks time for [an] independent investigation and access to the full discovery— particularly the FBI reports detailing the investigation into these alternate suspects."[104]

In sum, Garcia suggests that more might be found in a perusal of discovery in this case, including FBI files, but that their access to that information is limited. We agree that to the extent those records might include other suspects not apparent from the trial record, those allegations cannot be considered on direct appeal because we lack a sufficient record.

### (ii) Cross-Examination of Dundee Identification Witnesses

Finally, Garcia alleges that trial counsel was ineffective in their cross-examination of the Dundee identification witnesses. Specifically, Garcia argues that trial counsel

> misunderstood the hearsay rule on this issue and also missed significant opportunities to properly establish that the witnesses to the 2008 Dundee murders did not provide a consistent description of the suspect they saw walking through the neighborhood. . . .
>
> . . . Failing to effectively demonstrate differences in the eye witness' descriptions prejudiced Garcia.[105]

Again, Garcia notes that the lack of a complete record of trial counsel's activities and copies of the relevant discovery stymies appellate counsel's ability to determine what might have been missing from this cross-examination.

We find that this was not sufficiently alleged. Garcia argues that counsel "misunderstood" the hearsay rule, but does not explain how the hearsay rule was "misunderstood." Further,

---

[103] Brief for appellant at 384.

[104] *Id.*

[105] *Id*. at 385.

Garcia argues that the witnesses did not provide a "consistent description," but does not explain how the descriptions were not "consistent" or how counsel might have more "effectively demonstrate[d]" the differences in the description. Garcia does direct us to the testimony of the State's expert on joinder, which is part of the record. However, he neglects to detail the points made in that testimony, which are allegedly at issue here, though acknowledging that the testimony is part of the record before this court on appeal.

Finally, Garcia suggests that these issues cannot be determined on direct appeal because the record lacks "a full copy of the police reports in this case," and thus counsel cannot "specify the facts omitted . . . beyond those identified" in the testimony of the State's expert on joinder which, we note, were in fact not identified.[106] But, as set forth in his brief and restated above, Garcia's allegations are largely focused not on the omission of facts, but on the failure to demonstrate the difference in testimony.

We conclude that this allegation lacks the specificity required to support a claim on deficient conduct.

### (c) Conclusion

We find that there is no merit to Garcia's allegation regarding his right to an alibi instruction and that he did not sufficiently plead his claim regarding the cross-examination of the Dundee witnesses. We find that we cannot determine the remainder of his allegations on direct appeal.

## 10. Closing Arguments

### (a) Assignments of Error

Garcia assigns several errors relating to the State's closing arguments. Specifically, Garcia alleges (1) that the State engaged in prosecutorial misconduct with regard to inappropriate statements made during closing arguments. He further

---

[106] *Id.*

alleges that his counsel was ineffective in (2) failing to seek a mistrial in response to the State's closing arguments, (3) inviting the inappropriate comments made in the State's closing arguments, and (4) failing to research and abide by Nebraska law with regard to closing arguments.

(b) Standard of Review and
Propositions of Law

[39,40] When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, we will review the record only for plain error.[107] We apply the plain error exception to the contemporaneous-objection rule sparingly.[108]

[41,42] Prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.[109] In assessing allegations of prosecutorial misconduct, a court first determines whether the prosecutor's remarks were improper.[110] It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial.[111]

[43-46] Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process.[112] Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.[113] In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended

---

[107] *State v. Kipple*, 310 Neb. 654, 968 N.W.2d 613 (2022).

[108] *Id*.

[109] *Id*.

[110] *Id*.

[111] *Id.*

[112] *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016).

[113] *Id*.

to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether trial counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction.[114] A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.[115]

### (c) Prosecutorial Misconduct

Garcia takes issue with statements made both by the State during its closing argument and by his trial counsel during closing arguments.

We turn first to the allegations of prosecutorial misconduct. We note that Garcia did not object to these statements, and thus we review for plain error. Garcia argues that several statements were plain error.[116] Specifically, Garcia directs us to statements wherein the State described trial counsel's arguments as the "rantings of a lunatic" and implied that trial counsel was not trustworthy, reminding the jury that trial counsel said "'trust me,'" but continuing "[a]ll I can say to that is yikes, don't trust him."

At another point, Garcia argues, the State implied that defense counsel lied about the State's failure to turn over data from Garcia's electronic devices so Garcia's expert could review it:

> [T]he defense is caught, like, Oh, shoot, we got caught. What do they say? Oh, we didn't get it from the State. We're used to that, ladies and gentlemen. So what did we have? A receipt that . . . Motta signed back in 2013 showing they picked up that raw data. Appalling.

Garcia took further issue with several instances where the State notes that its experts have "integrity," while Garcia's experts are "hired gun[s]," and that Garcia's experts created

---

[114] *Id.*

[115] *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

[116] See *State v. Kipple, supra* note 107.

a "new industry" of creating "smoke screen[s]" to detract from the State's evidence. We note that Garcia takes issue with a few other exchanges that we do not set forth here but have reviewed, and upon our plain error review, we do not find those exchanges improper.

As for the comments specifically noted above, we conclude that these comments were certainly provocative; nevertheless, we find that they were not prejudicial. In coming to this conclusion, we consider the factors noted above. We first observe, as in the past, that juries are generally able to ignore these types of hyperbole and decide cases submitted to them based upon the evidence.[117]

Moreover, we note that the challenged statements were largely not about the evidence and thus would not tend to mislead or unduly influence the jury as to what the evidence showed. We also note that while Garcia argues that the statements made were extensive, the trial as a whole, and closing arguments specifically, were also extensive. To give some idea of this, the trial spanned over a month's time and comprises 21 volumes of the bill of exceptions prepared for this court's review. Of that, closing arguments span 212 pages, while only about 5 pages comprise the argument that Garcia now disputes. We also note that the jury was instructed that arguments were not evidence. Finally, we have extensively considered this record and find that the evidence supporting Garcia's convictions was ample.

We find no plain error in the State's closing arguments and find this assignment of error to be without merit.

### (d) Ineffective Assistance of Counsel

Garcia assigns several errors relating to the State's closing arguments. Because we find that the State did not engage in prosecutorial misconduct during its closing arguments, we find that counsel was not ineffective either in failing to seek

---

[117] *Id.*

a mistrial or in allegedly inviting the State's comments during closing arguments. As for the final allegation that counsel failed to engage in research regarding Nebraska law, we conclude that this allegation is conclusory in nature and we decline to address it further.

### (e) Conclusion

We find no merit to any of Garcia's allegations regarding closing arguments.

### 11. Death Penalty

We turn to the imposition of the death penalty in this case. On appeal, Garcia takes issue with the constitutionality of the death penalty, the aggravating and mitigating factors found in his case, and their weighing. He also argues that death sentences in this case were not proportional to other cases.

### (a) Additional Background

On October 26, 2016, Garcia was convicted of four counts of first degree murder, four counts of use of a weapon to commit a felony, and one count of attempted robbery. A notice of aggravation was filed with respect to each of the murder convictions. That notice alleged that as to all four victims—Hunter, Sherman, Roger, and Mary—the State intended to adduce evidence of three aggravating circumstances: (1) the murder was committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of such crime[118]; (2) the murder was especially heinous, atrocious, or cruel or manifested exceptional depravity by ordinary standards of morality and intelligence[119]; and (3) at the time the murder was committed, the offender also committed another murder.[120]

---

[118] See Neb. Rev. Stat. § 29-2523(1)(b) (Cum. Supp. 2022).

[119] See § 29-2523(1)(d).

[120] See § 29-2523(1)(e).

Garcia was found guilty following a jury trial. Two days later, an aggravation hearing was held before the same jury that had found Garcia guilty. No additional evidence was offered, and only brief arguments were had.

The jury was instructed as to the aggravating circumstances alleged by the State as to each of the four victims as follows:

MURDER TO CONCEAL COMMISSION OF ANOTHER CRIME OR TO CONCEAL THE IDENTITY OF ITS PERPETRATOR.

The essential elements necessary to prove this aggravating circumstance beyond a reasonable doubt are:

1. The defendant committed the murder of [victim] for the specific purpose of trying to conceal the commission of another crime; or

2. The defendant committed the murder of [victim] for the specific purpose of trying to conceal the identity of the perpetrator of another crime.

. . . .

. . . MURDER THAT IS ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL, OR MURDER MANIFESTING EXCEPTIONAL DEPRAVITY.

The essential elements necessary to prove this aggravating circumstance beyond a reasonable doubt are:

On the especially heinous, atrocious, or cruel prong:

1. The defendant inflicted serious mental anguish or serious physical abuse - meaning torture, sadism, or sexual abuse - on [victim] before his [or her] death. Mental anguish includes a victim's uncertainty as to his or her ultimate fate.

On the exceptional depravity prong:

1. The defendant apparently relished the murder of [victim]; or

2. The defendant inflicted gratuitous violence on [victim]; or

3. The defendant needlessly mutilated [victim]; or

4. There was a cold, calculated planning of [victim's] death, as exemplified by experimentation with the method of causing the death or by the purposeful selection of [victim] on the basis of specific characteristics.

. . . .

. . . MURDER COMMITTED AT THE TIME THE OFFENDER ALSO COMMITTED ANOTHER MURDER.

The essential elements necessary to prove this aggravating circumstance beyond a reasonable doubt are:

1. The offender murdered more than one person during the same criminal transaction in which [victim] was murdered.

Following the hearing, the jury found the following aggravators: As to Hunter and Sherman, the jury found that the murder of each was especially heinous, atrocious, or cruel or manifested exceptional depravity by ordinary standards of morality and intelligence and that at the time each murder was committed, the offender also committed another murder. As to Roger and Mary, the jury found that the murders were committed in an effort to conceal the commission of a crime or to conceal the identity of the perpetrator of such crime; that the murder of each was especially heinous, atrocious, or cruel or manifested exceptional depravity by ordinary standards of morality and intelligence; and that at the time each murder was committed, the offender also committed another murder.

Nearly 2 years later, Garcia's mitigation hearing was held. Following that hearing, the sentencing panel found only one statutory mitigating circumstance—that Garcia had no significant history of prior criminal activity. Further, while the sentencing panel noted that Garcia had previously sought psychiatric and psychological treatment, such did not rise to the level of a mitigating circumstance. After conducting its required proportionality review and finding no concerns, the panel considered the aggravating circumstances found by the jury, as well as the statutory mitigating circumstance found

by the panel, and sentenced Garcia to death on each of his four convictions for first degree murder.

### (b) Standard of Review and Propositions of Law

[47] The constitutionality of a statute presents a question of law, which an appellate court independently reviews.[121]

[48] When reviewing the sufficiency of the evidence to sustain the trier of fact's finding of an aggravating circumstance, the relevant question for the Nebraska Supreme Court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the aggravating circumstance beyond a reasonable doubt.[122]

[49] When an appellate court reviewing a death penalty invalidates one or more of the aggravating circumstances, or finds as a matter of law that any mitigating circumstance exists that the sentencing panel did not consider in its balancing, the appellate court may, consistent with the U.S. Constitution, conduct a harmless error analysis or remand the cause to the district court for a new sentencing hearing.[123]

[50] In order for a state appellate court to affirm a death sentence after the sentencer was instructed to consider an invalid factor, the court must determine what the sentencer would have done absent the factor.[124]

[51] Even a constitutional error which was harmless beyond a reasonable doubt does not warrant the reversal of a criminal conviction.[125]

[52] Harmless error review in a capital sentencing case looks to whether it is clear beyond a reasonable doubt that

---

[121] *State v. Trail, supra* note 38.

[122] *State v. Sandoval*, 280 Neb. 309, 788 N.W.2d 172 (2010).

[123] *Id*.

[124] *Id*.

[125] *Id*.

the sentencing court's decision would have been the same absent any reliance on an invalid aggravator.[126]

[53-56] In a capital sentencing proceeding, this court conducts an independent review of the record to determine if the evidence is sufficient to support imposition of the death penalty.[127] When reviewing the sufficiency of the evidence to sustain the trier of fact's finding of an aggravating circumstance, the relevant question for this court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the aggravating circumstance beyond a reasonable doubt.[128] A sentencing panel's determination of the existence or nonexistence of a mitigating circumstance is subject to de novo review by this court.[129] In reviewing a sentence of death, the Nebraska Supreme Court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances support the imposition of the death penalty.[130]

[57,58] Under Nebraska's capital sentencing scheme, a jury, if not waived,[131] only determines the existence of aggravating circumstances.[132] A jury's participation in the death penalty sentencing phase, if not waived,[133] ceases after the determination of aggravating circumstances.[134] A three-judge panel determines the existence of mitigating circumstances, weighs aggravating and mitigating circumstances, and determines

---

[126] Id.

[127] State v. Schroeder, 305 Neb. 527, 941 N.W.2d 445 (2020).

[128] Id.

[129] Id.

[130] Id.

[131] See Neb. Rev. Stat. § 29-2520(3) (Cum. Supp. 2022).

[132] See § 29-2520(4)(g).

[133] See § 29-2520(3).

[134] See § 29-2520(4)(g).

the sentence.[135] Neb. Rev. Stat. § 29-2522 (Cum. Supp. 2022) provides the guidelines for the three-judge panel's sentencing determination:

> The panel of judges for the sentencing determination proceeding shall either unanimously fix the sentence at death or, if the sentence of death was not unanimously agreed upon by the panel, fix the sentence at life imprisonment. Such sentence determination shall be based upon the following considerations:
>
> (1) Whether the aggravating circumstances as determined to exist justify imposition of a sentence of death;
>
> (2) Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances; or
>
> (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
>
> In each case, the determination of the panel of judges shall be in writing and refer to the aggravating and mitigating circumstances weighed in the determination of the panel.

[59] Under Neb. Rev. Stat. § 29-2521.03 (Cum. Supp. 2022), the Nebraska Supreme Court is required upon appeal to determine the propriety of a death sentence by conducting a proportionality review. Proportionality review requires the Nebraska Supreme Court to compare the aggravating and mitigating circumstances with those present in other cases in which a district court imposed the death penalty.[136] This is to ensure that the sentence imposed in the case under review is no greater than those imposed in other cases with the same or similar circumstances.[137]

---

[135] See Neb. Rev. Stat. § 29-2521 (Cum. Supp. 2022).

[136] *State v. Trail, supra* note 38.

[137] *Id.*

## (c) Constitutionality of Death Penalty

### (i) Assignments of Error

Garcia assigns error regarding the constitutionality of the death penalty. Specifically, he assigns, restated and consolidated, that the district court, sitting as the presiding judge of the three-judge sentencing panel, erred in not granting the Commission's motion to find the death penalty unconstitutional (1) as arbitrarily and capriciously administered in light of geographical discrepancies; (2) as violating *Hurst v. Florida*[138] with respect to the finding of aggravating factors, mitigating factors, and imposition of a death sentence; (3) as violating *United States v. Jackson*[139]; (4) as racially and geographically discriminatory; (5) as improperly delegating a legislative function to the executive branch in violation of the Nebraska Constitution; (6) as violating evolving standards of decency; and (7) in light of referendum violations. Garcia argues, relatedly, that the district court erred (8) in not finding that the lethal injection protocols violated Garcia's rights under the Administrative Procedure Act, as well as the state and federal constitutions, and (9) in not excluding victim impact statements requesting a specific outcome or characterizing the crime or the victim.

### (ii) Death Penalty
### Not Unconstitutional

Garcia first assigns that the district court, sitting as the presiding judge of the three-judge sentencing panel, erred in not finding the death penalty unconstitutional as arbitrarily and capriciously administered in light of geographical discrepancies in violation of *Furman v. Georgia*,[140] *Parker v.*

---

[138] *Hurst v. Florida*, 577 U.S. 92, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016).

[139] *United States v. Jackson*, 390 U.S. 570, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968).

[140] *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

*Dugger*,[141] and the 5th, 8th, and 14th Amendments to the U.S. Constitution, as well as article I, §§ 1, 3, 9, and 11, of the Nebraska Constitution, and also as racially and geographically discriminatory in violation of *Furman*, under the Equal Protection Clause and the Due Process Clause, as well as under the 8th and 14th Amendments to the U.S. Constitution and article I, §§ 1, 3, 9, and 11, of the Nebraska Constitution.

But this court has found this argument to be without merit.[142] Garcia acknowledges as much, but urges us to reconsider this precedent. We decline to revisit this authority and, as such, find this argument to be without merit.

Garcia also assigns that the presiding judge erred in not finding the death penalty unconstitutional under *Hurst*,[143] because Nebraska's statutes (1) prohibit the jury from assigning weight to aggravating circumstances, (2) prohibit presenting mitigating evidence to the jury, and (3) do not allow a jury to make the life or death determination in violation of the 6th, 8th, and 14th Amendments to the U.S. Constitution and article I, §§ 1, 3, 9, and 11, of the Nebraska Constitution.

We recently reiterated our rejection of this argument:

In *Hurst*, the Court held that a "hybrid" sentencing scheme, in which the jury made a merely "advisory" recommendation of life or death and did not make a binding finding as to the existence of any aggravating circumstance, violated the Sixth Amendment. The sentencing scheme required the jury to render an advisory verdict of life or death while the sentencing judge then exercised independent judgment to determine the existence of aggravating and mitigating factors and made an independent judgment, after weighing the aggravating and mitigating factors, about whether the sentence should be life or death. The sentencing statute specified that a

[141] *Parker v. Dugger*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).

[142] See *State v. Gales*, 265 Neb. 598, 658 N.W.2d 604 (2003).

[143] *Hurst v. Florida, supra* note 138.

defendant was not death eligible until the court (not a jury) made independent findings that the person shall be punished by death—which included finding that sufficient aggravating circumstances existed and that there were insufficient mitigating circumstances to outweigh the aggravating circumstances.

The Supreme Court in *Hurst* rejected the State's argument that the scheme was constitutional because a jury implicitly found at least one aggravating circumstance when it recommended the death penalty. The Court explained, "The State fails to appreciate the central and singular role the judge plays" under the law wherein "[t]he trial court *alone* must" make the "critical findings necessary to impose the death penalty" without which the defendant's maximum authorized punishment would be life imprisonment.

We recently addressed *Hurst* in *State v. Jenkins*. We held on direct appeal from the defendant's conviction and sentence to the death penalty that *Hurst* did not require us to reexamine our prior conclusion that the Sixth Amendment does not require the jury to determine mitigating circumstance, perform the balancing function, or conduct the proportionality review.

Similarly, in *State v. Lotter*, we held, for purposes of the statute of limitations for a postconviction action, that *Hurst* did not announce a new rule of law. We explained *Hurst* was merely an application of *Ring* to the sentencing scheme under which the judge alone found the existence of any aggravating circumstance that made the defendant death eligible.

We explained in *Lotter* that isolated references in *Hurst* to the sentencing scheme's requirement that the court find there were insufficient mitigating circumstances to outweigh the aggravating circumstances did not mean that the Supreme Court had held the jury rather than a judge must find that the aggravating circumstances outweigh

the mitigating ones. Rather, we sided with the opinion of most federal and state courts, which agree *Hurst* does not stand for the proposition that a jury must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating circumstances.

After *Jenkins* and *Lotter*, the U.S. Supreme Court, in *McKinney v. Arizona*, implicitly confirmed the validity of our analysis and the majority view. The Court held that on remand for a reweighing of the aggravating and mitigating circumstances (after federal habeas corpus review found the trial court had erred by refusing to consider the mitigating circumstance of the defendant's post-traumatic stress disorder), a judge, rather than a jury, could conduct the reweighing. The Supreme Court specifically rejected the defendant's argument that its holding in *Hurst* required a jury to reweigh aggravating and mitigating circumstances. The Court reiterated, "[I]n a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range." The Court explained that *Ring* and *Hurst* stand only for the proposition that a jury must find an aggravating circumstance that makes the defendant death eligible. "In short," said the Court, "*Ring* and *Hurst* did not require jury weighing of aggravating and mitigating circumstances" and "'States that leave the ultimate life-or-death decision to the judge may continue to do so.'"

By leaving to the three-judge panel the ultimate life-or-death decision upon making the selection decisions of whether the aggravating circumstances justify the death penalty and whether sufficient mitigating circumstances exist that approach or exceed the weight given to the aggravating circumstances, Nebraska's sentencing scheme

does not violate the Sixth Amendment right to a jury trial or article I, § 6, of the Nebraska Constitution.[144]

Garcia's assignments of error with respect to *Hurst* are without merit.

Garcia next assigns that the presiding judge erred in not finding that the death penalty was unconstitutional as violating *Jackson*, insofar as Nebraska's statutes discourage defendants from exercising their right to a jury determination of aggravators because the three-judge panel is required to make written unanimous findings of fact explaining the basis for their decision, but juries are not, in violation of the 6th, 8th, and 14th Amendments to the U.S. Constitution and article I, §§ 1, 3, 9, and 11, of the Nebraska Constitution.

As acknowledged by Garcia, we addressed and rejected this particular argument in *State v. Hessler*[145]:

> In *Jackson*, the U.S. Supreme Court found unconstitutional a federal statutory provision that authorized the imposition of a death sentence only when a jury recommended the death sentence. Under the statute, if the defendant waived jury trial or pled guilty, the maximum possible sentence the court could impose was a life sentence. The Court determined that the statutory provision was unconstitutional because it improperly coerced or encouraged the defendant to waive his or her Sixth Amendment right to a jury or his or her Fifth Amendment right to plead not guilty and because it needlessly penalized the defendant who asserted such rights.
>
> We do not find [the defendant's] reliance on *Jackson* applicable or persuasive. Unlike *Jackson*, under the Nebraska death penalty statutes, a defendant cannot avoid the risk of a death penalty by waiving the right to a jury determination of aggravating circumstances; even if the defendant waived such right, the sentencing panel

---

[144] *State v. Trail, supra* note 38, 312 Neb. at 898-901, 951 N.W.2d at 307-09.

[145] *State v. Hessler*, 274 Neb. 478, 502-03, 741 N.W.2d 406, 425 (2007).

could still impose a death penalty. Under the statutory provision in *Jackson*, the defendant could completely avoid the death penalty by waiving a jury trial or by pleading guilty. Under the Nebraska statutes, there is no such direct benefit achieved at the expense of waiving the right to a jury as there was in *Jackson.* By waiving the right to a jury under the Nebraska statutes, the sole benefit is that the defendant avoids the circumstance wherein the jury as fact finder finds aggravating circumstances and the judicial panel as fact finder determines the sentence. While the sentencing panel might be more thoroughly versed about the case if it had also found aggravating circumstances, this does not mean that the sentencing panel would necessarily make a sentencing decision that was more favorable to the defendant. Unlike *Jackson*, in which the benefit to waiving the right to a jury was the elimination of exposure to the death penalty, the Nebraska statutory scheme does not provide a clear advantage to a defendant who waives his or her right to have a jury determine aggravating circumstances. The Nebraska statutory scheme does not improperly coerce or encourage a defendant to waive his or her right to a jury and does not penalize a defendant who asserts such right.

We decline Garcia's request that we reconsider this decision and find that this assignment of error is without merit.

Garcia additionally assigns several errors relating to Nebraska's lethal injection execution protocols: namely, that the presiding judge erred in not finding that Neb. Rev. Stat. § 83-965 (Reissue 2014), which, among other things, grants the director of the Department of Correctional Services the authority to "create, modify, and maintain a written execution protocol," improperly delegates a legislative function to the executive branch in violation of article II, § 1, of the Nebraska Constitution, and further that the protocol violates

Garcia's rights under the Administrative Procedure Act,[146] as well as his rights under the 6th, 8th, and 14th Amendments to the U.S. Constitution, and article I, §§ 1, 3, 9, and 11, and article II, § 11, of the Nebraska Constitution.

We turn first to the argument that the Legislature improperly delegated to the director of the Department of Correctional Services its power over the written execution protocol. In support of this argument, Garcia relies on *Lincoln Dairy Co. v. Finigan*,[147] *Clemens v. Harvey*,[148] *Kwik Shop, Inc. v. City of Lincoln*,[149] and an Arkansas case, *Hobbs v. Jones*.[150] We disagree.

*Lincoln Dairy Co.* holds that the Legislature could not delegate to the Department of Agriculture the power to create rules and regulations, the violation of which would be a criminal offense. *Clemens* held that the precursor to the Department of Health and Human Services did not have the power to eliminate certain individuals from eligibility for medical assistance benefits. And *Kwik Shop* held that a statutory scheme for approval of a liquor license was unconstitutionally vague.

*Jones* is from Arkansas but is directly on point. There, the Arkansas Supreme Court held that the Arkansas Legislature had improperly delegated the creation of the state's lethal injection protocol to the Department of Correction. Since then, the Arkansas Legislature has revised the delegation and that revision has passed constitutional muster.[151]

Garcia fails to direct this court to our decision in *State v. Ellis*,[152] in which we held that it was not an unconstitutional delegation of power for the Legislature to grant the

---

[146] See Neb. Rev. Stat. § 84-901 et seq. (Reissue 2014).

[147] *Lincoln Dairy v. Finigan*, 170 Neb. 777, 104 N.W.2d 227 (1960).

[148] *Clemens v. Harvey*, 247 Neb. 77, 525 N.W.2d 185 (1994).

[149] *Kwik Shop v. City of Lincoln*, 243 Neb. 178, 498 N.W.2d 102 (1993).

[150] *Hobbs v. Jones*, 2012 Ark. 293, 412 S.W.3d 844 (2012).

[151] *Hobbs v. McGehee*, 2015 Ark. 116, 458 SW.3d 707 (2015).

[152] *State v. Ellis*, 281 Neb. 571, 799 N.W.2d 267 (2011).

ability to create a lethal injection protocol to the Department of Correctional Services. We have previously declined to revisit that decision[153] and continue to do so today. Garcia's assignment of error is without merit.

Garcia also assigns that Nebraska's lethal injection protocols violated his rights under the Administrative Procedure Act. Specifically, Garcia alleges that "[a]llowing the Director to determine which substance to use based upon the availability of the necessary substance(s)" is allowing the director to make a new "'rule, regulation, or standard,'" and further, that the "execution protocol allows the Director to make an independent determination of which lethal substance to use in executions and in what quantities without following [the Administrative Procedure Act] requirements at set forth [in] Neb. Rev. Stat. § 84-907(1) (Reissue 2014)."

A similar issue arose in Indiana in *Ward v. Carter*.[154] There, the applicable rules and regulations allowed the director of the Department of Correction to change the lethal injection protocol. A change was made to the protocol, altering the three-drug combination used. A death row inmate challenged the change, and the trial court dismissed the inmate's complaint. The Court of Appeals reversed, holding that the department must follow the Indiana version of the Administrative Procedure Act and that further, the execution protocol "constituted a 'rule.'"[155]

In *Ward*, the Indiana Supreme Court reversed, reasoning that only those rules that carry the effect of law are governed by the Indiana version of the Administrative Procedure Act. After analyzing the details of the lethal injection protocol, the court concluded that the lethal injection protocol did not carry the effect of law. As such, the court held that it could be modified without offending that act.

---

[153] *State v. Torres*, 283 Neb. 142, 812 N.W.2d 213 (2012).

[154] *Ward v. Carter*, 90 N.E.3d 660 (Ind. 2018).

[155] *Id*. at 662.

Garcia cites us to no other authority beyond the now-reversed Indiana Court of Appeals decision in *Ward v. Carter*.[156] Garcia suggests that the Indiana Court of Appeals' reasoning was sound and that we should follow it. We disagree.

In *Griffith v. Nebraska Dept. of Corr. Serv.*,[157] this court found that citizen taxpayers lacked standing to challenge the director's power over the lethal injection protocol. There, the State acknowledged that a death row inmate would probably have standing, and it even suggested that "a death row inmate who would not have 'receive[d] notice from the Attorney General's office that we will soon seek a death warrant' could assert a claim."[158]

But the procedural posture of those cases is different in that this is Garcia's direct appeal. The Department of Correctional Services is not a party to this litigation. There has been no record created to effectuate a determination on the issue raised by Garcia. We decline to further address the issue raised here because we conclude that it is not yet justiciable.[159]

Garcia also argues that the presiding judge erred in not finding that the death penalty was unconstitutional for violating evolving standards of decency under the 5th, 8th, and 14th Amendments to the U.S. Constitution, and article I, §§ 9, 11, 13, and 15, of the Nebraska Constitution. We have repeatedly found this argument to be without merit. We noted in *State v. Jenkins*[160]:

> [In 2016,] Nebraskans had the opportunity to eliminate the death penalty and 61 percent voted to retain capital

---

[156] *Ward v. Carter*, 79 N.E.3d 383 (Ind. App. 2017), *reversed, Ward v. Carter, supra* note 154.

[157] *Griffith v. Nebraska Dept. of Corr. Servs.*, 304 Neb. 287, 934 N.W.2d 169 (2019).

[158] *Id*. at 301, 934 N.W.2d at 179 (Miller-Lerman, J., concurring).

[159] See *Griffith v. Nebraska Dept. of Corr. Servs., supra* note 157.

[160] *State v. Jenkins*, 303 Neb. 676, 718-19, 931 N.W.2d 851, 883-84 (2019).

punishment. This vote demonstrates that the people of Nebraska do not view the death penalty as being contrary to standards of decency. As the majority of the U.S. Supreme Court recently explained: That the Constitution allows capital punishment "doesn't mean the American people must continue to use the death penalty. The same Constitution that permits States to authorize capital punishment also allows them to outlaw it. But it does mean that the judiciary bears no license to end a debate reserved for the people and their representatives." In Nebraska, the people have spoken.

The U.S. Supreme Court has not found the death penalty to be unconstitutional in all cases. As the Fifth Circuit determined, "We are bound by Supreme Court precedent which forecloses any argument that the death penalty violates the Constitution under all circumstance[s]." Similarly, we do not find the death penalty to be a violation of the Nebraska Constitution.

And we recently rejected a claim that "Nebraska's delegation of the selection criteria and ultimate life-or-death decision to the three-judge panel violates the Eighth Amendment to the U.S. Constitution and article I, § 9, of the Nebraska Constitution" made in *State v. Trail*.[161]

There is no merit to Garcia's contention that the death penalty violates evolving standards of decency.

Garcia next argues that the presiding judge erred in not finding that the imposition of the death penalty in light of referendum violations was contrary to Neb. Rev. Stat. § 32-1405(1) (Reissue 2016) and article II, § 1, of the Nebraska Constitution.

Some background is necessary.

"In May 2015, the Nebraska Legislature passed 2015 Neb. Laws, L.B. 268,—which abolished the death penalty in Nebraska—and then overrode the Governor's

---

[161] *State v. Trail, supra* note 38, 312 Neb. at 901, 981 N.W.2d at 309.

veto of the bill. The Legislature adjourned sine die on May 29. Because L.B. 268 did not contain an emergency clause, it was to take effect on August 30.

"Following the passage of L.B. 268, opponents of the bill sponsored a referendum petition to repeal it. On August 26, 2015, the opponents filed with the Nebraska Secretary of State signatures of approximately 166,000 Nebraskans in support of the referendum. On October 16, the Secretary of State certified the validity of sufficient signatures. Enough signatures were verified to suspend the operation of L.B. 268 until the referendum was approved or rejected by the electors at the upcoming election. During the November 2016 election, the referendum passed and L.B. 268 was repealed, that is, in the language of the constitution, the act of the Legislature was 'reject[ed].'"[162]

Since that time, several criminal defendants have relied upon this set of facts to argue that their death sentences were invalid.[163] We have rejected this argument on each occasion, reasoning that because of the initiation of the referendum process and the eventual approval of the referendum language, the repeal of the death penalty as passed by the Legislature in 2015 Neb. Laws, L.B. 268, was rejected without ever having taken effect.

Garcia acknowledges this case law but notes, correctly, that although we stated in *Hargesheimer v. Gale*[164] that the then-Governor was not implicated as a sponsor under § 32-1405, we have never determined whether the involvement of then-Governor Pete Ricketts in the referendum process was a

[162] *State v. Lotter*, 311 Neb. 878, 917, 976 N.W.2d 721, 747-48 (2022), quoting *State v. Jenkins, supra* note 160.

[163] See, *State v. Lotter, supra* note 162; *State v. Torres*, 304 Neb. 753, 936 N.W.2d 730 (2020); *State v. Mata*, 304 Neb. 326, 934 N.W.2d 475 (2019); *State v. Jenkins, supra* note 160.

[164] *Hargesheimer v. Gale*, 294 Neb. 123, 881 N.W.2d 589 (2016).

violation of the doctrine of separation of powers. Garcia cites one case in support of this argument—*State ex rel. Spire v. Conway*.[165] There, a tenured faculty member with Wayne State College was elected to the Legislature. The Legislature, in charge of the qualifications of its members, concluded that this employment (of which the professor was on unpaid leave) did not prevent him from taking his seat. We did not disturb that finding directly, but concluded that the professor, even when on unpaid leave, was employed by, and therefore a member of, the executive branch. We further concluded that the language of our constitution prohibited a member of one branch of government from exercising the authority of another and that thus, the professor, as a member of the executive branch, could not simultaneously exercise the authority of the legislative branch.

We find Governor Ricketts' actions during the referendum process distinguishable. In *Conway*, the professor was undisputedly acting as a member of the legislative branch in his role as a state senator. But the referendum process at issue here is expressly reserved for the people[166] and is not a legislative action at all, but instead sits outside of the three-branch structure. Even if we assume that Governor Ricketts was acting as a member of the executive branch at all relevant times, he was not exercising the authority of any other branch of government. This assignment of error is without merit.

Finally, we turn to Garcia's assertion that the presiding judge erred in not excluding victim impact statements requesting a specific outcome or characterizing the crime or the victim, in violation of the 5th, 8th and 14th Amendments to the U.S. Constitution, and article I, §§ 9, 11, 13, and 15, of the Nebraska Constitution.

Victim impact information may be considered in sentencing a convicted murderer, because "'"just as the murderer

---

[165] *State ex rel. Spire v. Conway*, 238 Neb. 766, 472 N.W.2d 403 (1991).

[166] See Neb. Const. art. III, § 3.

should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."'"[167] Nebraska's capital sentencing statutes authorize the sentencing panel to consider "[a]ny evidence at the sentencing determination proceeding which the presiding judge deems to have probative value."[168] And victim impact statements are admissible in evidentiary hearings conducted pursuant to § 29-2521(3), notwithstanding the fact that the statute does not make specific reference to them.[169] There is a substantive limitation on the admissibility of victim impact information: a victim's family members' characterizations and opinions about the crime, the defendant, or the appropriate sentence may not be received in evidence.[170]

Garcia complains that the probation office sent out requests for victim impact statements that specifically sought responses that were inadmissible. This issue was raised and argued to the district court. At that time, the court noted that part of its job was to wade through admissible versus inadmissible evidence like this and indicated that it would do so in this situation. Garcia does not suggest that the court failed to do this, nor is there any indication from the record that this inadmissible information was considered in sentencing Garcia. This assignment of error is without merit.

### (d) Aggravating Factors

#### *(i) Assignments of Error*

Garcia assigns that the presiding judge erred in (1) instructing the jury regarding various aggravating circumstances and (2) not granting the Commission's motion to correct the aggravators prior to mitigation and weighing, and he further

---

[167] *State v. Vela*, 279 Neb. 94, 162, 777 N.W.2d 266, 314 (2010).

[168] § 29-2521(2).

[169] See *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009).

[170] *State v. Vela, supra* note 167.

assigns that the sentencing panel erred in (3) considering various aggravating circumstances.

In addition, Garcia assigns that his trial counsel was ineffective in (4) failing to request jury instructions specifying other crimes committed under § 29-2523(1); (5) failing to request jury instructions relating to overlap under *State v. Williams*[171] and *State v. Stewart*[172]; (6) failing to object to the State's argument that the order of the Brumback murders did not matter; (7) failing to object to the State's argument that the victims suffered mental anguish; (8) arguing in closing that jurors should "look to [their] religions" in reaching their decisions; and (9) failing to research Nebraska's system of capital punishment and acquaint themselves with the aggravating circumstances prior to the aggravation hearing.

### (ii) Presiding Judge and Sentencing Panel Errors

In the three assignments of error regarding the aggravating circumstances considered in his death sentences, Garcia argues that the trial court erred (1) in not instructing the jury as to the "crime" for which Garcia sought to conceal his identity, and thus, the panel ought not to have considered aggravator (1)(b); (2) in not finding that aggravators (1)(b) and (1)(e) overlapped; and (3) with respect to aggravator (1)(d), by instructing the jury as to the term "mental anguish," which is not part of that (or any) aggravator and, as such, was error.

### a. Aggravator (1)(b)

Before the sentencing panel and on appeal, Garcia suggests that the jury instructions were erroneous and that the sentencing panel erred because the "predicate crime(s) for which Garcia sought to conceal his identity" were not identified.[173]

---

[171] *State v. Williams*, 217 Neb. 539, 352 N.W.2d 538 (1984).

[172] *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977), *disapproved on other grounds, State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986).

[173] Brief for appellant at 420.

Garcia further argues that contrary to the State's argument, it matters in what order the Brumbacks were killed.

To the extent that Garcia suggests this court has previously held that the predicate crime must be identified in the jury instructions, this is without merit. We held in *State v. Lotter*[174] that "for subsection (1)(b) to apply, a defendant must commit the murder in an effort to conceal some crime or to conceal the identity of the perpetrator of some crime other than the murder itself." But this court has uncovered no authority requiring a reference to the specific crime, and in fact, we have repeatedly affirmed the application of aggravator (1)(b) in the absence of such a specific instruction or identification.[175] None of the case law to which Garcia cites stands for that proposition.

We find no merit to Garcia's contention.

### b. Aggravators (1)(b) and (1)(e)—Overlap as Prohibiting Finding of Both

Garcia argues that on these facts there is overlap in the facts supporting both aggravator (1)(b), murder to conceal the identity of the perpetrator, and aggravator (1)(e), the defendant killed another at the time he killed the victim. Garcia asserts that this overlap is impermissible and that the sentencing panel should not have considered aggravator (1)(b) when weighing aggravating and mitigating circumstances.

A review of our case law suggests this court first noted that aggravating circumstances could not overlap in *Stewart*.[176] In *Stewart*, we concluded that on the facts presented, a robbery committed at the same time as a murder could not fulfill both aggravators (1)(b) and (1)(c) (murder for pecuniary gain), noting that the aggravators were "separate and

---

[174] *State v. Lotter*, 255 Neb. 456, 522-23, 586 N.W.2d 591, 635 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999).

[175] See, e.g, *State v. Torres, supra* note 153; *State v. Sandoval, supra* note 122; *State v. Vela, supra* note 167.

[176] *State v. Stewart, supra* note 172.

distinct circumstances and should be construed so as not to overlap."[177]

A few years later, in *Williams*, we expanded on this subject:

[The defendant] asserts that the sentencing court "overlapped" statutory aggravating circumstances subsection (1)(b), "The murder was committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime," and subsection (1)(e), "At the time the murder was committed, the offender also committed another murder." [The defendant] relies on *State v. Stewart* . . . "that subsections (1)(b) and (1)(c) are separate and distinct circumstances and should be construed so as not to overlap." The record before us demonstrates that the aggravating circumstances described by subsections (1)(b) and (e) were not comprised of the same facts and did not overlap. The aggravating circumstance of subsection (1)(b) existed because "the murder of Catherine M. Brooks was committed in an apparent effort to conceal the identity of the perpetrator of a crime," while the aggravating circumstance of subsection (1)(e) existed because [the defendant] killed *both* Catherine M. Brooks and Patricia A. McGarry "at or about the same time." The statutory aggravating circumstances indicated in subsections (1)(b) and (e) were distinct from each other. The existence of the aggravating circumstance described in subsection (1)(b) had no mutuality to the aggravating circumstance described in subsection (1)(e). Such independent existence of aggravating circumstances in this case prevents an overlapping of the statutory aggravating circumstances. [The defendant's] claim of overlapping aggravating circumstances has no merit.[178]

---

[177] *Id*. at 522, 250 N.W.2d at 864.

[178] *State v. Williams, supra* note 171, 217 Neb. at 544-45, 352 N.W.2d at 541-42 (citation omitted).

The sentencing panel rejected Garcia's overlap argument simply by noting that it had the discretion to consider any aggravators found by the jury, without touching on the contention that the jury ought not to have found both aggravators as a result of the overlap.

We find partial merit to Garcia's argument, at least insofar as the jury found both aggravator (1)(b) and aggravator (1)(e). The State's theory was that Roger was the target of the killings and that Mary was killed in an effort to keep her from disclosing the identity of the person who killed Roger. Alternatively, the State argued that Mary was killed first and that Roger was killed in an effort to keep him from disclosing who killed Mary.

When considered in this way, there is an overlap in facts. The State does not suggest that there was some other crime besides the murders—it explicitly argues that each victim was killed so there were no witnesses left to the murder of the other. These same facts set forth the basis for aggravator (1)(e), that at the time the murder was committed another murder was also committed. This is unlike the facts of *Williams*, where one victim was sexually assaulted and then both victims were killed. In *Williams*, the court explicitly found aggravator (1)(e) as to both victims, but aggravator (1)(b) only as to the assault victim. In other words, the sexual assault victim was killed so that she could not disclose the identity of her attacker, while another victim was killed at the same time, but not for any identified reason.

We find merit to the contention that on these facts there is overlap in aggravators (1)(b) and (1)(e). The impact of this will be discussed below.

### c. Aggravator (1)(d)

Garcia argues that the district court erred in instructing the jury on the term "mental anguish" because it is not an element of aggravator (1)(d) and thus was confusing to the jury.

### i. Mental Anguish

Garcia's argument is based on our decision in *State v. Sandoval*.[179] There, we first addressed the term "mental anguish" and its (lack of) place in our death penalty instructions. We noted that "'[m]ental anguish,' although included in Nebraska's pattern jury instructions, [did] not have any basis in Nebraska law. Neither the courts nor the Legislature has used the term 'mental anguish' as a part of . . . § 29-2523(1)(d)."[180] We continued:

> A jury instruction should correctly state the Nebraska law applicable to the issues in the case. Neb. Ct. R. § 6-801. Beginning with *State v. Rust*, . . . we have held that "especially heinous, atrocious, or cruel" includes murders involving torture, sadism, sexual abuse, or the imposition of extreme suffering, or where the murder was preceded by acts "performed for the satisfaction of inflicting either mental or physical pain or that pain existed for any prolonged period of time." . . . "'[H]einous, atrocious, or cruel'" was to be directed to the "conscienceless or pitiless crime which is unnecessarily torturous to the victim." . . .
>
> In the three decades since *Rust,* this court has not strayed from this definition. . . .
>
> . . . .
>
> In addition to the traditional definition of "especially heinous, atrocious, or cruel," pattern jury instruction NJI2d Crim. 10.4 added "mental anguish" to the first prong of aggravator (1)(d). The comment to this instruction cites *Walton v. Arizona* . . . as the source of this language. However, neither the Nebraska Legislature nor Nebraska courts have adopted "mental anguish" as a part of aggravator (1)(d). Although we acknowledged the addition of "mental anguish" to the definition of the

---

[179] *State v. Sandoval, supra* note 122.

[180] *Id*. at 351, 788 N.W.2d at 211.

aggravator in *Gales II,* its inclusion was not raised in that appeal and we did not consider its propriety. Now, given the opportunity to review the issue, we conclude that the inclusion of "mental anguish" was improper. Mental anguish is not a component of aggravator (1)(d), and it was error to include it in the instruction.

Even if the inclusion of "mental anguish" was supported by Nebraska law, we conclude that mental anguish defined as "a victim's uncertainty as to his or her ultimate fate" is not sufficiently narrow such that it would apply only to a subclass of defendants. . . . Whenever a State seeks to impose the death penalty, the discretion of the sentencing body "'must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.'" . . . The sentencing authority's discretion must be "'guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty.'" . . .

Although the U.S. Supreme Court upheld "'a victim's uncertainty as to his [or her] ultimate fate'" as a constitutional definition in *Walton*, . . . most, if not all, victims who are conscious before their death would suffer mental anguish as to the uncertainty of their ultimate fate. All victims threatened by a deadly weapon would have uncertainty as to their ultimate fate. Accordingly, we conclude that "a victim's uncertainty as to his or her ultimate fate" is not a meaningful distinction between cases that warrant the death penalty and those that do not. Mental anguish as defined is an improper ground for finding the existence of aggravator (1)(d).[181]

For the reasons plainly stated in *Sandoval*, the instruction as given to the jury in this case, which instructed the jury that it could find that the murder was "especially heinous,

---

[181] *Id*. at 351-54, 788 N.W.2d at 211-12 (citations omitted).

atrocious, or cruel" if the "defendant inflicted serious mental anguish" on the victims and further defined "mental anguish," was in error.

### ii. Exceptional Depravity

This does not end our inquiry. In the past, this court has approached an incorrect instruction on this aggravator in a few ways, dependent on the nature of the aggravator as a whole. We have interpreted aggravator (1)(d) in the disjunctive, where the first prong, "heinous, atrocious, [or] cruel," focuses on the experience of the victim, while the second prong, "exceptional depravity," focuses on the defendant's state of mind.[182]

In *Sandoval*, the issue was the improper mental anguish instruction and its impact on the defendant's death sentences. Relying on *State v. Reeves* (*Reeves III*),[183] we reviewed the giving of this instruction in *Sandoval* for harmless error and found that it was harmless:

> It is of particular importance that § 29-2522 instructs the sentencing panel to consider whether sufficient mitigating circumstances exist which *approach* or *exceed* the weight given to the aggravating circumstances. In *Reeves III*, . . . we could not conclude that the district court's error of failing to consider the statutory mitigator of intoxication was harmless, because "[w]e [did] not know what weight the judges may have given this circumstance if they had found it to exist." Had it considered the mitigator of intoxication, the *Reeves III* court could have determined that the weight of that mitigator approached or exceeded the weight the court gave to the aggravators. Therefore, failure to consider the mitigator was not harmless error.
>
> Unlike *Reeves III*, we know the weight the sentencing panel attributed to the aggravators and mitigators.

---

[182] *State v. Moore*, 210 Neb. 457, 470, 316 N.W.2d 33, 41 (1982).

[183] *State v. Reeves*, 239 Neb. 419, 476 N.W.2d 829 (1991).

It stated that each aggravator was "significant and substantial" and that "there are no statutory mitigating circumstances to weigh against the four aggravating circumstances and only one nonstatutory mitigating circumstance to which the panel gives little weight."

Absent consideration of aggravator (1)(d) with respect to each of the five counts of murder, the sentencing panel would have been left with three "significant and substantial" aggravators establishing that [the defendant] killed five victims to conceal his identity in the commission of a carefully planned bank robbery and, in doing so, placed three other people at great risk of death. The panel would have weighed these three "significant and substantial" aggravators against no statutory mitigators and only one nonstatutory mitigator—that [the defendant] suffered from a bad childhood—to which the panel gave little weight.

Knowing that the sentencing panel gave little weight to the lone nonstatutory mitigator it weighed against the aggravators, we are convinced beyond a reasonable doubt that the sentencing panel would have imposed sentences of death even in the absence of a finding that the murders were exceptionally heinous, atrocious, cruel, or manifested exceptional depravity. Accordingly, the consideration of aggravator (1)(d) was harmless error. It would be futile to vacate the sentences of death and require the sentencing panel to reweigh three "significant and substantial" aggravators against the lone nonstatutory mitigator, to which the panel gave little weight. Because the error is harmless, it is not necessary to vacate the sentences of death and remand the cause, as was required in *Reeves IV*.[184]

---

[184] *State v. Sandoval, supra* note 122, 280 Neb. at 362-63, 788 N.W.2d at 217-18 (citation omitted).

But we did not reach a harmless error analysis in *State v. Torres*,[185] where the mental anguish instruction was also erroneously considered:

We agree with [the defendant] insofar as he argues that mental anguish should have not been considered by the sentencing panel, and thus, the findings made by the panel to that end were erroneous. A jury may not consider a victim's mental anguish in finding the existence of the aggravating circumstance set forth in § 29-2523(1)(d). But unlike in *Sandoval,* where the error resulted in a finding that the aggravator was not established, in this case, the failure of this one finding does not mean the failure of the entire aggravator.

*Sandoval* dealt with an erroneous jury instruction with regard to mental anguish. The jury in *Sandoval* was asked to determine only whether the various aggravators were established and did not provide any additional factual findings. Thus, where the jury instruction was incorrect, it was not possible for this court to determine whether the jury's finding of the aggravator had been based upon the incorrect instruction and the entire aggravator had to be disregarded.

But aggravator (1)(d) provides as an aggravating circumstance that "[t]he murder was especially heinous, atrocious, cruel, *or* manifested exceptional depravity by ordinary standards of morality and intelligence." This aggravating circumstance contains two separate disjunctive components which may operate together or independently of one another. In *Sandoval,* the jury instruction and verdict form did not permit us to determine upon which prong the jury's finding of aggravator (1)(d) had been based—thus, we could not conclude that the jury's finding had not been based on the inclusion of "'mental anguish'" in the court's instruction on "'especially

---

[185] *State v. Torres, supra* note 153, 283 Neb. at 176-77, 812 N.W.2d at 243-44.

heinous, atrocious, or cruel.'" In this case, however, the sentencing panel made detailed findings and explained that *both* prongs of the aggravator had been proved. As a result, [the defendant] was not prejudiced by the sentencing panel's erroneous understanding of aggravator (1)(d)'s "especially heinous, atrocious, [or] cruel" provision so long as the evidence was sufficient to support the panel's finding that the murder exhibited exceptional depravity.

We then addressed whether the State had met its burden to prove the exceptional depravity prong of aggravator (1)(d) and concluded that it had.

Garcia's case is similar to *Torres*, in that both prongs of aggravator (1)(d) were implicated. So, like *Torres*, we can consider whether there was evidence to support the finding that the murder was exceptionally depraved:

"Exceptional depravity" pertains to the state of mind of the actor and may be proved by or inferred from the defendant's conduct at or near the time of the offense. . . . This court has identified specific narrowing factors that support a finding of exceptional depravity. These five factors are: (1) apparent relishing of the murder by the killer, (2) infliction of gratuitous violence on the victim, (3) needless mutilation of the victim, (4) senselessness of the crime, or (5) helplessness of the victim.[186]

In addition, this court[187] and the Eighth Circuit Court of Appeals[188] have approved of another narrowing factor that was alleged in this case: that "[t]here was a cold, calculated planning of [the victims'] death[s], as exemplified by

---

[186] *State v. Sandoval, supra* note 122, 280 Neb. at 354, 788 N.W.2d at 212 (citation omitted).

[187] *State v. Moore*, 250 Neb. 805, 553 N.W.2d 120 (1996), *disapproved on other grounds, State v. Reeves*, 258 Neb. 511, 604 N.W.2d 151 (2000); *State v. Moore, supra* note 182.

[188] *Moore v. Kinney*, 320 F.3d 767 (8th Cir. 2003) (en banc).

experimentation with the method of causing the death or by the purposeful selection of [the victims] on the basis of specific characteristics." "[O]nly . . . those elements that are supported by the pleadings and sufficient evidence" should be submitted.[189]

In *Sandoval*, the jury was instructed on whether the defendant apparently relished the murders. As noted above, this court ultimately found that the consideration of prong 1 ("especially heinous, atrocious, [or] cruel") was harmless. We addressed exceptional depravity in dicta, suggesting that the facts were insufficient to support the aggravator.

In *Sandoval*, the State presented evidence that the defendant was smiling during the murders and after being apprehended. A witness who unknowingly interrupted the robbery and murders in progress testified that the defendant smiled at her from behind the counter as he stood amid the bodies of his victims. Later that day, when an investigator photographed the defendant as he was booked into jail for the murders, the defendant smiled broadly for the photograph. We questioned whether this evidence was sufficient to support the jury's finding of this aggravator; however, we did not need to further consider the issue, because we concluded that the jury's finding of aggravator (1)(d) was harmless error.

We also considered the facts with respect to exceptional depravity in *Torres*:

The evidence in this case was sufficient to show beyond a reasonable doubt the presence of this aggravator with regard to Hall's death. A "helpless" victim is readily understood to be one who is unable to defend oneself, or to act without help. The evidence establishes that Hall was bound and gagged when he was shot, showing not only that Hall was helpless, but that the murder was senseless because Hall posed no threat to [the defendant]. And Hall was not simply shot to death—he had been

---

[189] NJI2d Crim. 10.4.

gagged and strangled to the point of asphyxiation, demonstrating the infliction of gratuitous violence.[190]

In *State v. Joubert*,[191] we affirmed the finding of the sentencing panel that the defendant's actions were exceptionally depraved, noting that the victims had been manually strangled and then stabbed multiple times. We observed that the evidence showed that except for the identity of the victims, the murders had been planned well in advance—driven by the defendant's need for intellectual and sexual curiosity—and that the victims were chosen based on the defendant's perception of whether the victim was defenseless or prepubescent. We also affirmed the finding that the murders were heinous, atrocious, and cruel.

And we recently agreed in *Trail* that the murder of the victim "reflected cold, calculated planning to find and kill a helpless victim to satisfy [the defendant's] curiosity and sexual proclivities" and that the "carvings . . . and other acts of strategic mutilation demonstrated he relished the murder" and held "'no regard'" for the victim's life.[192] As such, we agreed with the conclusion that the defendant in *Trail* acted with exceptional depravity.

The State's argument during Garcia's aggravation hearing was focused on the heinous, atrocious, or cruel prong. Still, the jury was instructed as to four of the six regularly employed factors with respect to exceptional depravity: relishing the murders; inflicting gratuitous violence during the murders; needless mutilation; and a cold, calculated plan. The court, in response to Garcia's motion asking it to disregard certain aggravators as found by the jury, explicitly concluded that the State had met its burden on "exceptional depravity."

Finally, there was evidence at trial to support that prong of the aggravator. In particular, there was evidence that the

---

[190] *State v. Torres, supra* note 153, 283 Neb. at 178, 812 N.W.2d at 244-45.

[191] *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986).

[192] *State v. Trail, supra* note 38, 312 Neb. at 906, 981 N.W.2d at 312.

carotid arteries of all four victims were severed; in addition, three of the four victims had severed jugular veins. The knives used to kill Hunter and Sherman were left in the victims' necks. Roger was killed by a gunshot wound but was also stabbed. Mary's body showed defensive wounds and other stab marks unrelated to the wounds that killed her, including evidence that one of her thumbs was nearly severed.

Extensive evidence was presented as to the State's theory of the case—that all of the victims were killed due to their connection to Creighton's pathology department that had, in 2000, terminated Garcia from its residency program. The State's theory alleged that Garcia traveled to Nebraska from Louisiana in 2008 to kill Hunter and Sherman and that 5 years later, in 2013, he returned to Nebraska, this time from Indiana, to kill the Brumbacks.

While the jury was erroneously instructed as to mental anguish, it was also instructed as to exceptional depravity. The district court specifically found that the State has met its burden with respect to exceptional depravity. And we find that the evidence presented clearly supported a finding of the exceptional depravity prong of aggravator (1)(d), showing at a minimum that Garcia inflicted gratuitous violence and needlessly mutilated the victims and that he had a cold, calculated plan and purposefully selected the victims in line with that plan. We are confident beyond a reasonable doubt that the jury would have found this aggravator even in the absence of the instruction regarding mental anguish.

### d. Harmless Error Analysis

[60] We turn to the issue of whether the consideration by the sentencing panel of aggravator (1)(b) as to the Brumback murders was harmless. If an error is harmless beyond a reasonable doubt in a capital sentencing case, an appellate court should affirm the sentence of the district court.[193] If the error

---

[193] See *State v. Sandoval, supra* note 122.

is not harmless, we cannot reweigh the aggravators and miti-gators and resentence a defendant; rather, we must remand the matter to the district court for resentencing.[194]

In *Sandoval*, we concluded that the erroneous consider-ation of aggravator (1)(d) was harmless because the sentenc-ing panel's order was sufficiently detailed with respect to the weight accorded the various aggravators and statutory mitiga-tor.[195] We lack such a specific order in this case.

But this is not dispositive here. Based on our analysis above, the only aggravator that must be disregarded is aggra-vator (1)(b) with respect to the Brumback murders (because it overlaps with aggravator (1)(e)). The sentencing panel sen-tenced Garcia to death for the Hunter/Sherman murders, where aggravators (1)(d) and (1)(e) were found, but aggravator (1) (b) was not. We therefore know that the facts of those murders were sufficient for the sentencing panel to ultimately conclude that death sentences were appropriate.

Because both of those aggravators were correctly found, Garcia has been sentenced to death on those murders. Whether his death sentences as to the Brumback murders remain stand-ing is largely semantics—he can only be executed once. Moreover, the theory of the State as to these murders was that they were part and parcel of the same revenge scheme, and the evidence shows many similarities between the crimes. As such, we are confident beyond a reasonable doubt that the sentencing panel would have sentenced Garcia to death for the Brumback murders even if only two aggravators, and not three, had been found by the jury.

There was no error in the sentencing panel's consideration of aggravator (1)(d), but the panel did err in considering aggravator (1)(b). Any error was harmless, however, because Garcia was sentenced to death on the basis of a jury's find-ing of two aggravators in the Hunter/Sherman murders. Those

---

[194] See *id.*

[195] *Id.*

aggravators support Garcia's death sentences and are enough to support Garcia's total sentence. In addition, given the similarity in the four murders, any consideration of an inapplicable aggravator (1)(b) in the Brumback murders was harmless. We accordingly find Garcia's three assignments of error to the presiding judge and sentencing panel to be without merit.

### (iii) Ineffective Assistance of Counsel

Garcia first assigns that his trial counsel was ineffective in failing to request jury instructions specifying the other crime committed under § 29-2523(1). We found above that Nebraska law does not require such an instruction. As such, trial counsel was not deficient in seeking such an instruction and we find no merit to this assignment of error.

Garcia next assigns that his trial counsel was ineffective in failing to request jury instructions relating to overlaps. We have concluded above that any error arising from such overlap was harmless and, as such, not prejudicial. There is no merit to this assignment of error.

Garcia also assigns that his trial counsel was ineffective in failing to object to the State's assertion that the order of the Brumback murders did not matter. Specifically, Garcia suggests that if his intent was to murder Roger, then in order to conceal his identity as the perpetrator of that murder, he must kill Roger, then Mary. But there is no such temporal requirement in this case. There is nothing to suggest that Garcia could not have first killed Mary in an attempt to conceal his identity as the person who was moments away from also killing Roger.

Because there was no error in the State's assertion regarding the order of the Brumback murders, counsel was not deficient in failing to object. There is no merit to this assignment of error.

Garcia next argues that trial counsel was ineffective in failing to object to the State's contention that the victims suffered mental anguish. We concluded above that this was error, but

that it was harmless, and that therefore, Garcia suffered no prejudice. There is no merit to this assignment of error.

Garcia assigns that his trial counsel was ineffective in telling jurors that they should "look to [their] respective religions and God" when making a determination about the aggravating circumstances. Garcia further directs us to case law in which the prosecution[196] and the court[197] made religious references before a jury. He argues that it is improper to make reference to such beliefs because to do so appeals to the jury's passions and prejudices and seeks to inflame or misinform the jury.

But it was not the State or the court who made these statements—it was Garcia's counsel. We neither endorse nor reject the statement, but Garcia has a Sixth Amendment right to present his own defense.[198] While that right is not unfettered,[199] we find no prohibition in our case law against a defendant making statements which essentially seek to remind the jury that it is not necessarily bound to find aggravating factors if it chooses not to do so. While a defendant might not be entitled to an instruction on jury nullification, a jury is still entitled to nullify a verdict[200]—and that is effectively what Garcia's counsel was doing in making this argument to the jury. Counsel's conduct was not prejudicial, and thus, there is no merit to Garcia's assertion that counsel was ineffective.

Finally, Garcia argues that counsel was ineffective in failing to research Nebraska's system of capital punishment prior to Garcia's aggravation hearing. We find that Garcia cannot show that he was prejudiced by any such deficiency. As we have concluded, there was no error in the jury's finding of

---

[196] *Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991).

[197] *U.S. v. Ornelas-Rodriguez*, 12 F.3d 1339 (5th Cir. 1994).

[198] See, e.g., *McKaskle v. Wiggins*, 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984).

[199] *State v. Clausen*, 307 Neb. 968, 951 N.W.2d 764 (2020).

[200] See *State v. Green*, 238 Neb. 492, 471 N.W.2d 413 (1991).

the aggravating factors and the sentencing panel's consideration of those factors. There is no merit to this assignment of error.

### (e) Mitigating Factors and Weighing of Factors

#### *(i) Assignments of Error*

Garcia makes several assignments of error relating to the mitigation hearing. He assigns that the sentencing panel erred in (1) not finding and affording more weight to various mitigating circumstances. In addition, he assigns that his trial counsel was ineffective in (2) failing to research and gather mitigating evidence from the outset of the case and (3) failing to facilitate the work of successor counsel.

#### *(ii) Sentencing Panel Error*

We turn to Garcia's assignment of error alleging that the sentencing panel erred in not affording more weight to other mitigating circumstances, both statutory and nonstatutory, and in turn not finding that the mitigating factors approached or exceeded the weight of the aggravating circumstances and justified the death penalty.

Garcia first argues that § 29-2523(2)(b) should have been found applicable and given some weight. That statute provides that "[t]he offender acted under unusual pressures or influences . . . ."[201] Garcia contends that he felt pressure to succeed in medicine and that "without feeling this pressure, Garcia would not have persisted at his [S]isyphean task of continuing to pursue medicine despite his apparent inability to succeed. And, had he abandoned medicine in favor of a more suitable career path, he would not have felt repeatedly thwarted by the Creighton Pathology Department."[202]

---

[201] § 29-2523(2)(b).

[202] Brief for appellant at 433.

Our de novo review of the record affirms the sentencing panel's failure to find such a factor applicable. We reiterated in *Lotter* that the "'provision contemplates only outside pressures, not those created by the defendant's own acts.'"[203] Garcia chose to remain in the medical field and continue to place himself under the pressures he perceived from that choice. This mitigating circumstance is not applicable on these facts.

Garcia also argues that the panel erred in rejecting the mitigating circumstances of § 29-2523(2)(c) and (2)(g). Subsection (2)(c) provides that "[t]he crime was committed while the offender was under the influence of extreme mental or emotional disturbance," and subsection (2)(g) states that "[a]t the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication."

The sentencing panel, in concluding that § 29-2523(2)(c) and (2)(g) did not apply, noted that it was not supported by the evidence. In our de novo review, we agree. While there was evidence that Garcia was an alcoholic, the record shows that the impact of that alcoholism on Garcia's functioning varied over time. Moreover, we note that there was no evidence that Garcia was intoxicated at the time of either the 2008 or 2013 murders. We find persuasive the finding of the panel that these murders were separated by 5 years, "during which time [Garcia] worked full time as a physician, supported himself, purchased a home[,] and demonstrated he was capable of being a law abiding citizen." The record further showed that Garcia was raised in a home with an attentive father and mother and a positive relationship with his family. While he struggled some during his educational career, his IQ was average and he graduated from high school, college, and medical school. In short, our review of the record does not support a conclusion that Garcia was under the influence of

---

[203] *State v. Lotter, supra* note 174, 255 Neb. at 515, 586 N.W.2d at 632.

an "extreme mental or emotional disturbance" under subsection (2)(c), or any impairment of Garcia's ability to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law under subsection (2)(g).

### (f) Balancing and Proportionality

### *(i) Assignments of Error*

Garcia argues on appeal several assignments relating to the presiding judge and sentencing panel's balancing and weighing of aggravating and mitigating factors in reaching its eventual decision to sentence Garcia to death. Garcia assigns that the sentencing panel erred in (1) not finding that the mitigating factors approached or exceeded the weight of the aggravating factors; (2) finding that his death sentences were proportional in this instance; (3) considering only first degree murder sentences that resulted in death sentences when conducting its proportionality review; and (4) concluding, after conducting its balancing of aggravating and mitigating circumstances, that Garcia's case merited death.

### *(ii) Balancing*

Our de novo review of the record does not suggest that the sentencing panel erred in its weighing of aggravating and mitigating factors. Though as discussed above, the jury found an additional aggravator, such finding was harmless. We conclude that the two aggravators as to each of the four murder convictions outweigh the one statutory mitigator—that Garcia had no significant criminal history—along with the limited evidence of non-statutory mitigation.

### *(iii) Proportionality*

We find that the sentencing panel did not err with regard to its proportionality analysis. Garcia argues that the panel erred in considering only first degree murder cases that resulted in the death penalty as opposed to considering all first degree murder cases. And Garcia contends that the panel erred in

finding that his death sentences were proportional to other death sentences.

First, we consider and reject Garcia's contention that we should consider all first degree murder cases and not just those that resulted in the death penalty. This court held in *State v. Palmer*[204] that it was appropriate to consider only those cases where the death penalty had been imposed because in such cases, an aggravating factor has been found, and that only such cases are "'similar'" for purposes of the imposition of the death penalty. We have continued to apply this rule since that time, as recently as in *Trail*,[205] and we decline to reconsider it today.

Moreover, we conclude that the imposition of a death sentence in this case is proportional to other cases where the death penalty has been imposed. Our proportionality review, required by § 29-2521.03, is designed to ensure that no sentence imposed shall be greater than those imposed in other cases with the same or similar circumstances and that, as noted above, such review should include only those cases in which the death penalty was imposed.[206]

The evidence here shows that Garcia traveled to Nebraska from Louisiana in 2008, took certain precautions so as not to be identified, then murdered two people, after which he left the state. The evidence further shows that Garcia waited nearly 5 years, during which time he attempted to further his education, obtained employment, and bought a house and a vehicle—in short, he lived a normal life. But in 2013, Garcia began investigating individuals connected to his time at Creighton, before returning to Nebraska to murder two more people. Garcia did so in an effort to exact revenge on Creighton's

---

[204] *State v. Palmer*, 224 Neb. 282, 330, 399 N.W.2d 706, 737 (1986), *overruled on other grounds, State v. Chamber*s, 233 Neb. 235, 444 N.W.2d 667 (1989).

[205] See *State v. Trail, supra* note 38.

[206] *Id.*

pathology department, because it had terminated him from its residency program. In effecting these murders, he severed the jugular veins of all four of his victims, the carotid arteries of three of his victims, left the knives in at least two of his victims, both stabbed and shot one victim, and left multiple puncture marks on another.

We have reviewed our relevant decisions on direct appeal from other cases in which the death penalty was imposed and do not find the imposition of the death penalty is a greater penalty than the sentences imposed in other cases with similar circumstances. For example, in *Trail*,[207] and in *Joubert,*[208] we affirmed convictions for murders that the evidence showed were "coldly planned," in a manner similar to this case. And in *Trail*, *Joubert*, and S*tate v. Mata*,[209] the death penalty was imposed in cases involving instances of gratuitous violence and unnecessary mutilation. The crimes committed against Hunter, Sherman, Roger, and Mary were utterly senseless and cruel. The sentences of death in this case are not excessive or disproportionate to the penalty imposed in similar cases. We uphold the sentencing panel's imposition of the death penalty.

### (g) Conclusion

We conclude that the sentencing panel erred in considering aggravator (1)(b) with respect to the Brumback murders, but that this error was harmless. Otherwise, we find no error in the imposition of the death penalty.

## 12. Broad-Scale Ineffectiveness and Procedural Bar

### (a) Assignments of Error

We turn to Garcia's final assignments of error. Garcia assigns on appeal that (1) the cumulative effect of trial counsel's

---

[207] *Id*. at 907, 981 N.W.2d at 313.

[208] *State v. Joubert, supra* note 191, 224 Neb. at 432, 399 N.W.2d at 251.

[209] *State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008).

ineffectiveness constructively denied him assistance of counsel and (2) this court should abolish the procedural bar in postconviction motions.

### (b) Standard of Review

[61] Whether cumulative error deprived a criminal defendant of his or her Sixth Amendment right to a trial by an impartial jury presents a question of law to be reviewed de novo.[210]

### (c) Cumulative Error

We turn first to Garcia's assignment regarding cumulative error. Although one or more trial errors might not, standing alone, constitute prejudicial error, their cumulative effect may be to deprive the defendant of his or her constitutional right to a public trial by an impartial jury.[211]

But we found no merit to any of Garcia's assigned errors. We concluded that approximately half of Garcia's claims of ineffective assistance are either without merit or not alleged with sufficient particularity. Nor are we able, on direct appeal, to resolve Garcia's remaining claims of ineffective assistance of trial counsel. Those unresolved claims cannot form the basis for a claim of cumulative error. Garcia's cumulative error argument is without merit.

### (d) Procedural Bar

Garcia asserts that this court should "abandon its precedent concluding that a party cannot raise an issue in a postconviction motion if he or she could have raised that same issue on direct appeal."[212] We recently set forth this underlying rule with approval in *Lotter*.[213] We decline Garcia's request that we reconsider our procedural bar, and we find Garcia's final assignment of error to be without merit.

---

[210] *State v. Anders, supra* note 25.

[211] *Id.*

[212] Brief for appellant at 461.

[213] *State v. Lotter, supra* note 162.

## V. CONCLUSION

We cannot determine on direct appeal whether counsel was ineffective in certain regards. We otherwise affirm Garcia's convictions and sentences.

Affirmed.